## MENNEN CO. v. FEDERAL TRADE COMMISSION. *

(Circuit Court of Appeals, Second Circuit. March 13, 1923.)

No. 69.

1. **Trade-marks and trade-names and unfair competition ☜80½, New, vol. 8A Key-No. Series—Federal Trade Commission without jurisdiction to regulate business methods unless unfair.**

    The purpose of Federal Trade Commission Act Sept. 26, 1914 (Comp. St. §§ 8836a–8836k), was to prevent unfair methods of competition in interstate commerce, and unless a person, partnership, or corporation is using unfair methods the Commission has no authority to interfere.

2. **Trade-marks and trade-names and unfair competition ☜80½, New, vol. 8A Key-No. Series—Allegation that practice of varying discounts tended to hinder competition a pleader's conclusion.**

    In proceedings by the Federal Trade Commission to require respondent to desist from unfair methods of competition, the allegation that respondent's practice of varying discounts tended unduly to hinder competition between distributors of its products to retailers or directly to the consuming public is a pleader's conclusion.

3. **Statutes ☜217—Reports and statements of committee in charge of bill may be considered to resolve ambiguity.**

    In the case of an ambiguous or obscure statute the intent of Congress may be gathered from statements in reports of committees having the legislation in charge in either House of Congress, and statements made on the floor of either House by the committee in charge of the bill in the course of its passage may in like manner be considered.

4. **Trade-marks ad trade-names and unfair competition ☜68—Allowance of varying discounts to wholesalers and retailers not unfair competition.**

    Where a manufacturer sold both to wholesalers and retailers, its allowance to wholesalers of a discount which it denied to retailers and its classifying in the group of retailers, mutual or co-operative corporations organized and owned by retailers, and its refusal to sell to such retailers' organizations at wholesale prices, was not unfair competition in violation of Clayton Act, § 2 (Comp. St. § 8835b), and the Federal Trade Commission Act, § 5 (Comp. St. § 8836e); there being no attempt by the manufacturer to fix resale price and no discrimination between retailers or between wholesalers.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 43 Sup. Ct. 705, 67 L. Ed. ——.

Petition to Review Order of the Federal Trade Commission.

Petition by the Mennen Company to review an order of the Federal Trade Commission, requiring the respondent to cease and desist from certain methods of competition in interstate commerce in violation of law. Order reversed.

This cause comes here on petition to review an order made on March 3, 1922, by the Federal Trade Commission.

The petitioner is a corporation organized under the laws of the state of New York, with its principal offices and place of business in the city of Newark in the state of New Jersey. It is engaged in the business of manufacturing and selling talcum powder, tooth paste, shaving soap, and various other toilet articles, causing the same to be transported to purchasers thereof from the state of New Jersey into various other states of the United States and foreign countries in direct competition with other persons and corporations similarly engaged. It is hereinafter referred to as the respondent.

The Federal Trade Commission on April 15, 1920, filed a complaint against the respondent and subsequently an amended complaint on January 27, 1921. It alleged that respondent had adopted a plan for the allowance of trade discounts in the marketing of its products; that in pursuance of such plan respondent has and continues to classify its customers into two groups according to a basis of selection adopted by it and has allowed and does allow to purchasers of the same quantity and quality of its products, different discount rates according to the classification of such purchasers by respondent. It is further alleged that this practice of varying discounts, irrespective of quantity and quality, tends unduly to hinder competition between distributors of respondent's products to retailers or directly to the consuming public. It is also alleged that, by reason of the facts recited, the respondent is using an unfair method of competition in commerce, within the intent and meaning of section 5 of an act of Congress, entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914 (Comp. St. § 8836e).

It further alleged that the varying discount rates allowed by the respondent are a discrimination in price between purchasers of respondent's commodities for use, consumption, or resale within the United States and the District of Columbia, the effect of which may be to substantially lessen competition in the distribution of respondent's products or between distributors thereof.

It is further alleged that such discrimination is not founded in differences in the grade, quality, or quantity of the commodity sold and does not make only due allowance for difference in the cost of selling or transportation and is not made in good faith to meet competition; that the plan for classification of customers and the allowance of varying discount rates is not a selection of customers in bona fide transactions not in restraint of trade.

It is also alleged that the actions and doings of the said respondent referred to and recited are contrary to the intent and meaning of section 2 of an act of Congress, entitled "An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes," approved October 15, 1914 (Comp. St. § 8835b).

The respondent filed an answer denying the jurisdiction of the Commission. It also denied the material allegations of the amended complaint and asked that it be dismissed. The motion to dismiss was overruled and denied.

Hearings were had and evidence was introduced, before an examiner of the Commission, in support of the allegations of the amended complaint and on behalf of the respondent. Then the proceeding came on for final hearing, and the Commission having heard argument and considered the record made its findings as to the facts and its conclusion. Its conclusion was that the practices of respondent amounted to unfair methods of competition in interstate commerce and a violation of the acts of Congress hereinbefore mentioned. And an order to cease and desist was entered.

Gilbert H. Montague, Joseph W. Goodwin, and Charles Furnald Smith, all of New York City, for petitioner.

W. H. Fuller, Chief Counsel Federal Trade Commission of Washington, D. C., and W. T. Kelley, of New York City, for respondent.

Felix H. Levy, of New York City, for Wholesale Dry Goods Ass'n, National Hardware Ass'n, National Supply & Machinery Dealers' Ass'n, National Wholesale Jewelers' Ass'n, National Floor Covering Ass'n, and American Brush Manufacturers' Ass'n as amici curiæ.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The transactions complained of are transactions in interstate commerce, and the acts with which the respondent is charged are done in the course of such commerce. The practices in which the respondent is engaged as charged· in the complaint are admitted by it in its answer, but it denies that those practices tend unduly to hinder competition, or that they constitute an unfair method of competition in commerce, or amount to a restraint of trade.

Two acts of Congress are herein involved. The Federal Trade Commission Act, being the act of September 26, 1914, 38 Stat. 717, 724, which provides in section 5 (Comp. St. § 8836e) "that unfair methods of competition in commerce [i. e. interstate commerce] are hereby declared unlawful," and the Clayton Act, being the Act of October 15, 1914, which was passed to supplement existing laws against unlawful restraints and monopolies, 38 Stat. 730, and which provides in section 2 (Comp. St. § 8835b) as follows:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: Provided, that nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And provided further, that nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade."

This section of the Clayton Act provides in substance that it shall be unlawful for any person engaged in interstate or foreign commerce to discriminate in price between different purchasers of commodities in transactions within the United States or under its jurisdiction "where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Before considering the provision of section 2 of the Clayton Act, we find it necessary to consider the Federal Trade Commission Act which lies at the basis of this entire proceeding.

[1] The Federal Trade Commission Act having declared that "un-

fair methods of competition in commerce" are unlawful, and created a Federal Trade Commission, empowered and directed it to prevent persons, partnerships, or corporations except banks, and common carriers subject to the acts to regulate commerce, "from using unfair methods of competition in commerce." And unless a person, partnership, or corporation is engaged in using "unfair methods of competition" the Commission has no authority whatever to proceed under the act.

We are therefore confronted with the question as to what is meant by the words "unfair methods of competition in commerce" as used in the act. That question was before the Supreme Court in 1919 in Federal Trade Commission v. Gratz, 253 U. S. 421, 40 Sup. Ct. 572, 64 L. Ed. 993. That case went up from this court (258 Fed. 314, 169 C. C. A. 330, 11 A. L. R. 793) and affirmed the conclusion at which we arrived. The defendants were partners and were engaged in selling ties and bagging for cotton bales. They sold principally to jobbers and dealers who resold the same to retailers, cotton ginners, and farmers. For more than a year they had refused to sell any such ties unless the prospective purchasers would also buy from them the bagging to be used with the number of ties proposed to be bought. This was held plainly insufficient to show an unfair method of competition. In the opinion, which was written by Mr. Justice McReynolds, the court said:

"The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade. * * *

"The complaint contains no intimation that Warren, Jones & Gratz, did not properly obtain their ties and bagging as merchants usually do; the amount controlled by them is not stated; nor is it alleged that they held a monopoly of either ties or bagging or had ability, purpose or intent to acquire one. So far as appears, acting independently, they undertook to sell their lawfully acquired property in the ordinary course, without deception, misrepresentation, or oppression, and at fair prices, to purchasers willing to take it upon terms openly announced."

In this case, as in the Gratz Case, the complaint contains no intimation that the Mennen Company has any monopoly of the business of manufacturing and selling toilet articles or that it has the ability or intent to acquire one. So far as appears the Mennen Company, acting independently, has undertaken to sell its own products in the ordinary course, without deception, misrepresentation, or oppression, and at fair prices, to purchasers willing to take them upon terms openly announced.

[2] In this case, as in the Gratz Case, nothing is alleged which would justify the conclusion that the public suffered injury or that competitors had reasonable ground for complaint. The allegation that its practice of varying discounts tended unduly to hinder competition between distributors of respondent's products to retailers or directly

to the consuming public is a pleader's conclusion. The acts complained of in this case are not those which have heretofore been regarded as "opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." And as said in the Gratz Case:

"If real competition is to continue, the right of the individual to exercise reasonable discretion in respect of his own business methods must be preserved."

The Clayton bill, as originally introduced, did not contain the words "where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce," now found in section 2, but contained the words "with the purpose or intent thereby to destroy or wrongfully injure the business of a competitor, of either such purchaser or seller."

The record filed in this court shows no contention by the Commission that the practices complained of have lessened competition as between the Mennen Company and its competitors, but it shows at the most that the practices have decreased competition among the Mennen Company's customers, or those desiring to become such. And it is said that if the phraseology above quoted as originally contained in the bill had been retained therein upon final passage instead of the phraseology, likewise above quoted, which was substituted therefor, there might be just ground for the claim that the Clayton Act proscribes practices which injure competition among the customers of the manufacturer, and not merely competition between such manufacturer and his competitors. But the elimination of the phraseology contained in the bill as originally reported and the substitution therefor of the phraseology in the form in which the bill was finally enacted strongly indicates that Congress did not have in contemplation the former character of competition but only the latter.

In the phraseology of the bill as originally reported the intention was unmistakably expressed that it was intended to protect by its prohibitions both kinds of competition, competition between the manufacturer and his competitors, as well as competition between customers of the manufacturer. The act as reported prohibited acts "with the purpose or intent to thereby destroy or wrongfully injure the business of a competitor, of either such purchaser or seller."

[3] We have recently had occasion to point out that in the case of an ambiguous or obscure statute the intent of Congress may be gathered from statements in reports of committees having the legislation in charge in either House of Congress. U. S. ex rel. Fazio v. Tod (C. C. A.) 285 Fed. 847, decided November 13, 1922. And statements made on the floor of either House by the committee in charge of the bill in the course of its passage may in like manner be considered. See Duplex Printing Press Co. v. Deering, 254 U. S. 443, 475, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

It is a matter of common knowledge that prior to the enactment of the Clayton Act a practice had prevailed among large corporations of lowering the prices asked for their products in a particular locality in

which their competitors were operating for the purpose of driving a rival out of business. Such lowering of prices was maintained within the particular locality while the normal or higher prices were maintained in the rest of the country; and this practice was continued until the smaller rival was driven out of business, whereupon the prices in that locality would be put back to the normal level maintained in the rest of the country. The Clayton Act was aimed at that evil. This appears from the Report of the Judiciary Committee of the House of Representatives from which we quote as follows:

"Section 2 of the bill is intended to prevent unfair discriminations. It is expressly designed with the view of correcting and forbidding a common and widespread unfair trade practice whereby certain great corporations and also certain smaller concerns which seek to secure a monopoly in trade and commerce by aping the methods of the great corporations, have heretofore endeavored to destroy competition and render unprofitable the business of competitors by selling their goods, wares, and merchandise at a less price in the particular communities where their rivals are engaged in business than at other places throughout the country. * * *

"The necessity for legislation to prevent unfair discriminations in prices with a view of destroying competition needs little argument to sustain the wisdom of it. In the past it has been a most common practice of great and powerful combinations engaged in commerce—notably the Standard Oil Company, the American Tobacco Company, and others of less notoriety, but of great influences—to lower prices of their commodities, oftentimes below the cost of production in certain communities and sections where they had competition, with the intent to destroy and make unprofitable the business of their .competitors, and with the ultimate purpose in view of thereby occuiring a monopoly in the particular locality or section in which the discriminating price is made. * * *

"In seeking to enact section 2 into law we are not dealing with an imaginary evil or against ancient practices long since abandoned, but are attempting to deal with a real, existing, widespread, unfair and unjust trade practice that ought at once to be prohibited in so far as it is within the power of Congress to deal with the subject."

There is nothing in the Report of the Committee which shows that in reporting the bill the Committee had in mind anything more than the suppression of the evil above referred to.

This substitution in the final stages of the Clayton Bill of the clause to which we have referred plainly indicates the intent of Congress to exclude from the operation of the section mere competition among "purchasers" from the "seller" or "person" who allowed or withheld the discount and to include therein only competition between such "seller" or "person" and the latter's own competitors. It was the latter class of competition and not the former which had been "the common practice of great and powerful combinations engaged in commerce" to which the Committee in its report referred. And there is nothing in the report of the Judiciary Committee, of either House, or in anything said on the floor of either House by those in charge of the bill, which indicates or suggests any such interpretation which the Commission in this case has placed upon the act.

[4] What the Mennen Company has done was to allow to "wholesalers" who purchased a fixed quantity of their products a certain rate of discounts while to the "retailers" who purchased the same quantities it denied the discount rates allowed to the "wholesalers." This does not indicate any purpose on the part of the Mennen Com-

pany to create or maintain a monopoly. The company is engaged in an entirely private business, and it has a right freely to, exercise its own independent discretion as to whether it will sell to "wholesalers" only or whether it will sell to both "wholesalers" and "retailers," and if it decides to sell to both it has a right to determine whether or not it will sell to the "retailers" on the same terms it sells to the "whole-salers." It may announce in advance the circumstances, that is the terms, under which it will sell or refuse to sell. In United States v. Colgate & Co., 250 U. S. 300, 307, 39 Sup. Ct. 465, 468 (63 L. Ed. 992, 7 A. L. R. 443), the Supreme Court declared that—

"In the absence of any purpose to create or maintain a monopoly, the Act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell. 'The trader or manufacturer, on the other hand, carries on an entirely private business, and may sell to whom he pleases.' United States v. Trans-Missouri Freight Association, 166 U. S. 290, 320. 'A retail dealer has the unquestioned right to stop dealing with the wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade.'"

In the Colgate Case the court sustained the right of a manufacturer engaged in a private business to announce in advance the prices at which his goods may be resold and his right to refuse to deal with wholesalers or retailers who do not conform to such prices. As subsequently explained by the court, that case was decided upon the ground that the manufacturer had an undoubted right to specify resale prices and to refuse to deal with any one who failed to maintain the same. It did not appear that the Colgate Company had undertaken to enter into any agreements, express or implied, which undertook to obligate vendees to observe specified resale prices. And in the case now before the court it does not appear and is not alleged that the Mennen Company ever undertook to fix the prices at which its products were to be resold by those who purchased from it.

In Federal Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 42 Sup. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882, the subject was gone into very fully, and the Colgate Case was explained and the reason for that decision was clearly stated, and it was made evident that if the Colgate Company had undertaken by agreements express or implied to obligate those to whom it sold its products to observe specified resale prices a different decision would have been rendered. In the Beech-Nut Case the right to fix the prices at which the manufacturer will sell is again fully recognized. But the course which the Beech-Nut Company had adopted was condemned because of the method it pursued to control the resale prices. The difficulty was that the manufacturer had adopted and was enforcing a system of fixing and maintaining certain specified standard prices at which its products should be resold by purchasers thereof with the purpose of eliminating competition in prices among all jobbers engaged in handling the products manufactured by the company. And the court after reviewing its previous decisions (250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443; United States v. Schrader's Sons, Inc.,

252 U. S. 85, 40 Sup. Ct. 251, 64 L. Ed. 471; Frey & Son v. Cudahy
Packing Co:, 256 U. S. 208, 41 Sup. Ct. 451, 65 L. Ed. 892) said:

"By these decisions it is settled that in prosecutions under the Sherman
Act a trader is not guilty of violating its terms who simply refuses to sell
to others, and he may withhold his goods from those who will not sell them
at the prices which he fixes for their resale. He may not, consistently with
the act, go beyond the exercise of this right, and by contracts or combina-
tions, express or implied, unduly hinder or obstruct the free and natural
flow of commerce in the channels of interstate trade."

In Sears, Roebuck & Co. v. Federal Trade Commission, 258 Fed.
307, 312, 169 C. C. A. 323, 328 (6 A. L. R. 358) the Circuit Court of
Appeals in the Seventh Circuit declared in speaking of the Federal
Trade Commission Act of September 26, 1914, 38 St. 717, c. 311:

"We find in the statute no intent on the part of Congress, even if it has
the power, to restrain an owner of property from selling it at any price that
is acceptable to him or from giving it away."

And in Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co.,
227 Fed. 46, 49, 141 C. C. A. 594, 597, we declared in our opinion writ-
ten by Judge Lacombe:

"Before the Sherman Act it was the law that a trader might reject
the offer of a proposing buyer, for any reason that appealed to him; it
might be because he did not like the other's business methods, or because
he had some personal difference with him, political, racial, or social. That
was purely his own affair, with which nobody else had any concern. Neither
the Sherman Act, nor any decision of the Supreme Court construing the same,
nor the Clayton Act, has changed the law in this particular. We have not
yet reached the stage where the selection of a trader's customers is made
for him by the government."

In accordance with these opinions we have no doubt that the Men-
nen Company had the right to refuse to sell to retailers at all, and if
it chose to sell to them that it had the right to fix the price at which
it would sell to them, and that it was under no obligation to sell to them
at the same price it sold to the wholesalers. It did not discriminate
as between retailers but sold to all retailers on one and the same scale
of prices. And it did not discriminate as between wholesalers but
sold to all wholesalers on one and the same scale of prices. There
is nothing unfair in declining to sell to retailers on the same scale
of prices that it sold to wholesalers, even though the retailers bought
or sought to buy the same quantity the wholesalers bought.

In conclusion it ought perhaps to be said that we have not been
unmindful of the fact that the Mennen Company in classifying pur-
chasers into two groups, those of wholesalers and retailers, placed
in the group of retailers a class of mutual or co-operative corpora-
tions which purchased in large quantities the Mennen products. These
mutual or co-operative corporations, it is admitted, consist solely of
the retailers in the same line of trade; the stock being held exclusively
by retailers. The fact that these individuals, admitted by the counsel
for the Federal Trade Commission to be retailers, see fit for their own
convenience to organize themselves into a corporation which they con-
stitute their agent for purchasing purposes, does not change their
character, or the character of their purchases, and convert them into
wholesalers.

Whether a buyer is a wholesaler or not does not depend upon the quantity he buys. It is not the character of his buying, but the character of his selling, which marks him as a wholesaler, as this court pointed out in Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., supra. A wholesaler does not sell to the ultimate consumer, but to a "jobber" or to a "retailer." The persons who constitute these mutual or co-operative concerns are buying for themselves to sell to ultimate consumers, and not to other "jobbers" or to other "retailers." The nature of the transaction herein involved is not altered by the fact that they make their purchases through the agency of their corporation. For some purposes a corporation is distinct from the members who compose it. But that distinction is a fiction of the law, and the courts disregard the fiction whenever the fiction is urged to an intent and purpose which is not within its reason and policy. And in such a case as this the fiction cannot be invoked. The important fact is that the members of the corporation are all retailers who buy for themselves to sell to the ultimate consumer. The Mennen Company is within its rights in classifying them as retailers.

The facts established by the testimony are not sufficient to constitute a violation either of the Federal Trade Commission Act or of the Clayton Act, and they do not support the Commission's conclusions of law. The Mennen Company is not shown to have practiced "unfair methods of competition in commerce."

The order to cease and desist is reversed.