## FEDERAL TRADE COMMISSION v. PARAMOUNT FAMOUS–LASKY CORPORATION et al.
### No. 286.

Circuit Court of Appeals, Second Circuit.
April 4, 1932.

Robt. E. Healy, Chief Counsel, Federal Trade Commission, and Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, both of Washington, D. C., for petitioner.

Cravath, De Gersdorff, Swaine & Wood, of New York City (Frederick H. Wood and

Bruce Bromley, both of New York City, of counsel), for respondents.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The Federal Trade Commission issued an order against the respondents, directing them to cease and desist from certain practices found by it to constitute methods of unfair competition in violation of section 5 of the Federal Trade Commission Act (38 Stat. 719, 15 USCA § 45). That part of the order sought to be enforced directs the respondents to cease and desist "from leasing or offering to lease for exhibition in a theater or theaters motion picture films in a block or group of two or more films at a designated lump sum price for the entire block or group only and requiring the exhibitor to lease all such films or be permitted to lease none; and from leasing or offering to lease for exhibition such motion picture films in a block or group of two or more at a designated lump sum price for the entire block or group and at separate and several prices for separate and several films, or for a number or numbers thereof less than the total number, which total or lump sum price and separate and several prices shall bear to each other such relation as to operate as an unreasonable restraint upon the freedom of an exhibitor to select and lease for use and exhibition only such film or films of such block or group as he may desire and prefer to procure for exhibition; or shall bear such relation to each other as to tend to require an exhibitor to lease such entire block or group or forego the lease of any portion or portions thereof; or shall bear such relations to each other that the effect of such proposed contract for the lease of such films may be substantially to lessen competition or tend to create a monopoly in any part of the certain line of commerce among the several States, or with foreign nations, involved in the said proposed sale, to wit: the business of the production, distribution and exhibition of motion picture films to the public, or the business of production and distribution, or of production or distribution of moving picture films for public exhibition." No review of all or any part of the order entered has been sought by the respondents. However, upon an application to enforce the order, it is not essential to establish a violation of the Commission's order, for the first question we must examine in the proceeding is whether or not there has been a violation of the law. Fed. Trade Comm. v. Balme, 23 F.(2d) 615

(C. C. A. 2), certiorari denied, 277 U. S. 598, 48 S. Ct. 560, 72 L. Ed. 1007. The statute grants jurisdiction to the court to enter, upon the pleadings, testimony, and proceedings, a decree affirming, modifying, or setting aside an order entered by the Commission, and in so doing the court has the power to examine the whole record and ascertain for itself the issues presented and whether there are material facts not reported by the Commission. Fed. Trade Comm. v. Curtis Pub. Co., 260 U. S. 568, 43 S. Ct. 210, 67 L. Ed. 408. Section 5, which is alleged to have been violated, has reference to unfair methods of competition in commerce, which are declared to be unlawful, and, in determining whether given acts amount to unfair methods of competition within the meaning of the act, the standard is the one "established by the Sherman Anti-Trust Act [15 USCA § 1 et seq.] in the words 'restraint of trade or commerce' and 'monopolize, or attempt to monopolize,' and by the courts in construing the Sherman Act with reference to acts 'which operate to the prejudice of the public interest by unduly restricting competition or unduly obstructing the due course of trade,' and 'restrict the common liberty to engage therein.'" Fed. Trade Comm. v. Beech-Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Standard Oil Co. of N. J. v. Fed. Trade Comm., 282 F. 81, 87 (C. C. A. 3). A practice which is against public policy because of its dangerous tendency unduly to hinder competition or create a monopoly, is declared to be unfair and unlawful by section 5. Fed. Trade Comm. v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993. And public policy is the policy of the common law, equity or statutory, with statutes paramount. Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328.

The Famous Players-Lasky Corporation is a New York corporation engaged in the business, interstate and foreign, of producing, leasing, transporting, and distributing to exhibitors, and exhibiting for profit, motion picture films. These films are produced at their studios located in several states of the United States, and are distributed and transported therefrom in interstate commerce to theaters located in several other states. It is in competition with other producers. The individual respondents are officers of the corporation, and as such operate and control its business activities. The Commission found that it adopted a method of leasing its films under a system known as "block booking." Under such plan, films were offered in blocks

only. A block is a group of films offered as a unit, containing a number of individual motion pictures which are available for lease by exhibitors for three months or for one year. Such blocks contain 13 or 26 films, or 52 or 104 films, according to whether the theater changes films once or twice a week. The individual films in blocks being offered are not always identical. The blocks offered to an exhibitor contain certain films which the exhibitor may not want to lease, but he must lease all or none. He may not select some of the individual films and reject others contained in the block unless he exercises the option to pay prices found by the Commission to be arbitrarily fixed from 50 to 75 per cent. higher than the estimated prices of such films as part of the block. If the exhibitor declines to take all, the block is successively offered to his competitors until a lease is made. Only if all competitors refuse the block are the individual films offered to exhibitors upon some other basis arrived at by negotiation between the producer and exhibitors. The Commission determined this method of distribution to be unfair, and that the purpose and effect of the alternative offer is to coerce and intimidate an exhibitor into surrendering his free choice in the leasing of films, and into leasing films in blocks as offered, thereby denying to such exhibitor the opportunity and profit of leasing and exhibiting certain other films of higher qualities and which such exhibitor's patrons demand and which such exhibitor desires to exhibit. It is thus concluded by the Commission that this distribution policy lessens competition and tends to create a monopoly in the motion picture industry by tending to exclude from the market and industry independent producers and distributors of films, and denies to the exhibitors freedom of choice in leasing films.

There are seven other producers of major rank and some smaller who are in competition with the respondents. The evidence discloses the total number of feature pictures released annually, and the percentage thereof produced by the respondent in the years 1919 to 1923 is shown in the table [a] below. Since 1919 there has been a reduction in the percentage of feature films released by the respondent, and table [b] below sets forth the percentage which film rentals received by the respondent from feature pictures were of the total rentals paid to all producers and distributors for feature pictures for the same period.

From this, it is apparent that the general production of feature pictures has likewise declined since 1919, and these tables demonstrate that there is free competition among producers and distributors for the distribution and marketing of their pictures. There is a lack of monopolization by the respondent and, in fact, lack of ability to achieve a monopoly and therefore not a business operation which would unduly hinder competitors, as indicated by the footnote [c] showing, first, the total number of feature pictures released during the years 1919 and 1923 respectively; second, the number and percentage of total released by the respondent; third, the number and percentage of total released by each of the respondent's principal competitors; and, fourth, the number and percentage released by smaller distributors. These tables

| [a] Year | All Companies | FPL Released | Per Cent. FPL Released |
|---|---|---|---|
| 1919 | 815 | 139 | 17 |
| 1920 | 735 | 116 | 16 |
| 1921 | 830 | 120 | 14 |
| 1922 | 707 | 95 | 13 |
| 1923 | 527 | 61 | 12 |

| [b] Period | Percentage of film rentals for FPL Features |
|---|---|
| Fiscal year June 30, 1919 to June 30, 1920 | 29.8 |
| Fiscal year June 30, 1920 to June 30, 1921 | 28.2 |
| June 30, 1921 to January 1, 1922 | 30.8 |
| Calendar year 1922 | 25.5 |
| Calendar year 1923 | 22.1 |
| Calendar year 1924 | 20.5 |

| | Number of Features 1919 | Per cent. of Total 1919 | Number of Features 1923 | Per cent. of Total 1923 | Per cent. of increase or decrease in per cent. of total distribution |
|---|---|---|---|---|---|
| Total of all producers | 815 | 100 | 527 | 100 | 0 |
| Respondent | 139 | 17.05 | 61 | 11.57 | −32.3 |
| Universal Film Mfg. Co. | 64 | 7.85 | 63 | 11.95 | +52.2 |
| Fox Film Corp. | 70 | 8.58 | 55 | 10.43 | +21.5 |
| Pathe | 58 | 7.11 | 26 | 4.93 | −30.7 |
| Warner Brothers | | | 11 | 2.10 | new comer |
| Metro. Goldwyn | 83 | 10.18 | 60 | 11.38 | +11.8 |
| First National | 21 | 2.57 | 46 | 8.72 | +34 |
| United Artists | 3 | .36 | 11 | 2.08 | +477.7 |
| Miscellaneous state rights companies | 117 | 14.35 | 108 | 20.49 | +42.8 |

indicate a state of free competition in the industry and sufficiently negative the finding of the Commission that the respondent dominates the industry. The percentages disclosed by the evidence sufficiently demonstrate that the respondents have not absorbed the exhibition time of the first-run theaters, to the exclusion of other producers, large or small. Nor has the method of negotiation for the leasing of its films shown effective or destructive injury to first-run houses. About one-half of the houses of the key cities are disclosed not to have shown the respondent's pictures, and, of those showing its pictures, but a small percentage have shown them in substantial numbers. In the last two years, approximately three-fourths of those showing respondent's pictures show less than 25 per cent. thereof. There is no finding by the Commission that the method of negotiation in block booking, which it condemns, was generally successful in the distribution of their pictures to the detriment of respondent's competitors, nor is there a finding in respect to the existence or absence of free and active competition in the industry generally. The record discloses that the respondent's releases in 1923 were but 12 per cent. of the total releases, and this shows a decline in percentage since 1919. The small producer or distributor, as distinguished from the larger companies, has not been shown to have been affected by any combination between the large companies. The respondent's sales methods have not been shown to have any effect upon its competitors—the smaller producers—when the whole field is surveyed, and it is impossible to say on the evidence that the effect of block booking as practiced by the respondent, or its accumulative effect as practiced independently by the respondent and others, has unfairly affected competition. On the other hand, it may fairly be said that all persons engaged in the production of pictures have been able successfully to distribute their product. This has permitted fair competition in the industry.

■ It is admitted that the purpose of the respondent's method of negotiation and block booking is to sell the entire product to a single exhibitor in a single locality, but the method is said to deny to exhibitors freedom of choice in leasing films. Where an offer, unaccompanied by any declaration that the exhibitor must take all or none, is accepted, there is no restraint upon the exhibitor's freedom of choice. If the offer is rejected and the respondent refuses to consider the lease of less than the block until the block has been successively offered to the exhibitor's competitors, there is no restraint placed upon the freedom of choice of the exhibitor if all refuse the block. But if, under these circumstances, the exhibitor is induced to take all, by refusal of respondent at that time to consider the lease of less, the result is not due to denial or freedom of choice, but to the exercise of his choice of two alternatives, namely, to refuse at that time to take the block and await developments as to other competitors, or to take the block and thereby forestall any of his competitors from obtaining it. After this, there is the insistance on an increase in price by the respondent if individual films are accepted. But these we regard as merely ordinary incidents of bargaining and negotiating between seller and buyer, out of which a contract may or may not result. In either case, the buyer exercises his legal right to purchase or not, as he chooses. A distributor of films by lease or sale has the right to select his own customers and to sell such quantities at given prices, or to refuse to sell at all to any particular person for reasons of his own. Fed. Trade Comm. v. Raymond Bros-Clark Co., 263 U. S. 565, 44 S. Ct. 162, 68 L. Ed. 448, 30 A. L. R. 1114; United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443; Nat. Biscuit Co. v. Fed. Trade Comm., 299 F. 733 (C. C. A. 2); Great A. & P. Tea Co. v. Cream of Wheat Co., 227 F. 46 (C. C. A. 2). But in the sale or lease, it is unlawful if the sale is attempted to be brought about by an agreement, either actual or implied, as to the maintenance of resale prices. United States v. A. Schrader's Sons, Inc., 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471; Harriet Hubbard Ayer, Inc., v. Fed. Trade Comm., 15 F.(2d) 274 (C. C. A. 2). No such effort was made here.

■ The Commission did not find that the method of negotiation for the leasing of the films in question was carried on by the respondent as the result of a conspiracy or agreement with other producers, and, in the absence of such finding, they had an undoubted right to sell in blocks or to adhere to a policy of terms of sale, price of sale, and persons to whom they sold. Of course, there are some exceptions to a sales policy which we think are not applicable here. The Commission may not interfere with the respondent's attempt to effectively dispose of their products as a whole before entering upon negotiations for the disposition of less than all. Nor is this method of negotiation and sales creative of a dangerous tendency to unduly hinder competition or to create a monopoly.

Fed. Trade Comm. v. Beech Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Fed. Trade Comm. v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 575, 64 L. Ed. 993. We see nothing in the method of competition which is disclosed by the efforts of salesmanship involved in the respondent's business which has or can have any dangerous tendency unduly to hinder competition or to create a monopoly. The method of distribution by sale or lease, or the practice of selling through a common distributor is open to every other producer, large or small, to the extent of his pictures produced. To the extent that the method of negotiation carried on by the respondent is successful, the greater number of pictures produced by it and the greater number which may be placed at wholesale in a single contract, may result from the size of its business and the industry it employs. But the size alone does not give rise to a violation of the law. United States v. International Harvester Co., 274 U. S. 693, 47 S. Ct. 748, 71 L. Ed. 1302; United States v. U. S. Steel Corp., 251 U. S. 417, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121. The mere fact that a given method of competition makes it difficult for competitors to do business successfully is not of itself sufficient to brand the method of competition as unlawful and unfair. Fed. Trade Comm. v. Curtis Pub. Co., 260 U. S. 568, 43 S. Ct. 210, 213, 67 L. Ed. 408: Fed. Trade Comm. v. Sinclair Refining Co., 261 U. S. 463, 43 S. Ct. 450, 67 L. Ed. 746. From the tables referred to above, it is apparent that the respondent did not have a monopoly in the film industry.

 It is true that the Commission in its findings (paragraph 11) determined that the "acts, practices, and things done as hereinbefore set forth, have unduly hindered and are now unduly hindering, the competition in interstate commerce of competing producers and distributors of motion picture films; and * * * have a dangerous tendency to create * * * a monopoly in the motion picture industry." This finding relates to and includes block booking, for it says (paragraph 10), "The purpose and necessary effect of such distribution policy is to lessen competition and to tend to create a monopoly in the motion picture industry, tending to exclude from the market and the industry small independent producers and distributors of films and denying to exhibitors freedom of choice in leasing of films." An examination of the record reveals, however, that this is a conclusion of the author of this finding, which is not sustained by the evidence. Without

support by evidence in the record, it will not sustain the order to cease and desist. Nat. Biscuit Co. v. Fed. Trade Comm., supra; Mennen Co. v. Fed. Trade Comm. (C. C. A. 2) 288 F. 774, 30 A. L. R. 1120. The Commission is required to make findings of fact, but whether a given method of competition is fair or unfair within the meaning of the act is a question of law for the courts. Fed. Trade Comm. v. Gratz, supra; Fed. Trade Comm. v. Beech Nut Packing Co., supra. The respondent is not required, under the law, to so conduct its business that every competitor may conduct his with an equal degree of success according to his size and importance. It was not the purpose of the act to equalize opportunity or insure an equal degree of success upon the part of all competitors in a given industry, but it was its purpose to preserve, for the benefit of the public, active competition therein, and, where there is no question of monopoly involved, the question is whether the method of competition described has a dangerous tendency unduly to hinder competition. Fed. Trade Comm. v. Gratz, supra. As the Supreme Court put it in Fed. Trade Comm. v. Curtis Pub. Co., supra, "Effective competition requires that traders have large freedom of action when conducting their own affairs. Success alone does not show reprehensible methods, although it may increase or render insuperable the difficulties which rivals must face."

 In the instant case, there is no finding that the respondent combined with other large producers for the purpose of hindering those outside the large combination, and the evidence would not warrant such a finding. In the absence of combination or agreement, the fact that the method of negotiation as practiced by the respondent tends to exclude other independent producers is of itself insufficient to establish any probable tendency toward the creation of the evils prohibited by the Sherman Anti-Trust Act (15 USCA § 1 et seq.). Where a practice is not inherently unlawful and unfair, and its legality depends upon its effect, a finding that it has a dangerous tendency unduly to hinder competition or create a monopoly, must be based upon its effect as demonstrated upon the experience of competitors. Fed. Trade Comm. v. Standard Oil Co., 261 U. S. 463, 43 S. Ct. 450, 67 L. Ed. 746.

The cases of Paramount Famous-Lasky Corp. v. United States, 282 U. S. 30, 51 S. Ct. 42, 75 L. Ed. 145, and United States v.

First Nat. Pictures, 282 U. S. 44, 51 S. Ct. 45, 75 L. Ed. 151, in no way support the decision of the Commission. The freedom of contract therein protected was the right to contract independently of a restraint placed upon either party by an agreement with others, and the vice of the agreement condemned was that by unlawful agreement, or conspiracy the distributors had agreed among themselves not to contract with exhibitors, except in accordance with a form of agreement to which all distributors agreed to adhere. That question is not involved in this case. The basis of the order here sought to be enforced is that, by refusing to consider an offer for less than a block of pictures, until the possibility of selling the same block to others had been exhausted, the respondent exerts pressure upon the exhibitor for the purpose of compelling or inducing him to take the block, and that is said to be unfair and unlawful, for it is claimed to deny to the exhibitor freedom of choice in the purchase of his pictures. But that freedom is denied only if the distributor is able to find some other exhibitor who will take the block. If, on the other hand, he cannot, the first bidder for the picture may buy at the increased price.

Moreover, the evidence in the record discloses that the effect of this method of negotiation has not been to unduly restrain the exhibitor's freedom of choice. It is only a small percentage of contracts made which are for blocks offered. The greater number are shown to be for a few pictures only. The record shows that the respondent succeeded in making a total of 9,128 contracts with exhibitors for pictures in groups and of these 57½ per cent. were for ten pictures or less. This, it would seem, demonstrates that the method of negotiation prohibited by the cease and desist order has not had the effect of unduly restraining the exhibitor's freedom of selecting from among the pictures offered those which he desires.

Nor is the alternative offer permitted to be made for the films, that is, to lease less than a block at higher prices, a coercive or intimidating method. The Commission found that the alternative prices are "so high as to make it impossible for him (the exhibitor) successfully to compete with rival theaters." The exhibitor can freely accept or refuse this offer. If the distributor has the right to sell or attempt to sell his films and the right to make terms which are reasonable, this offer of sale under such terms in no way restrains competition in trade; it constitutes merely a part of the ordinary process of bargaining

with the customer for the sale of one's product. Each sale, because of the difference in films, presents an individual problem which must be considered by the buyer and seller according to the circumstances and in conformity with their best judgments. At no time did the respondent refuse to sell if its terms were met. It engaged in a lawful effort to market its products at what it deemed to be desirable terms.

 Nor may the order be supported upon the theory that the contracts made for the leasing of the films are unlawful as tying or exclusive contracts and opposed to public policy. A tying contract is one in which one or more different articles are tied together for sale. Such contracts are not unlawful as opposed to public policy per se but only when insisted upon in a sale by a corporation which has a monopoly. Fed. Trade Comm. v. Gratz, supra. Section 3 of the Clayton Act (15 USCA § 14) makes it unlawful to lease or make a contract for the sale of goods "on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise * * * of a competitor * * * of the lessor or seller, where the effect of such lease, sale, or contract * * * may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

No such contract is made here. When pictures are leased in blocks, they are not tied together, and the respondent's pictures are not indispensable to any exhibitor. And as said in Fed. Trade Comm. v. Gratz, supra: "All question of monopoly or combination being out of the way, a private merchant, acting with entire good faith, may properly refuse to sell, except in conjunction, such closely associated articles as ties and bagging. If real competition is to continue, the right of the individual to exercise reasonable discretion in respect of his own business methods must be preserved. U. S. v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443; U. S. v. A. Schrader's Son, Inc., 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471."

 It is true that respondent's pictures are copyrighted and that one cannot use them except under lease or license, but by reason thereof no monopoly in the pictures has been created, and moreover the respondent's pictures are not indispensable to any exhibitor, as found by the Commission. Exhibitors need pictures, to be sure, but not necessarily respondent's. Its competitors have pictures

which are also covered by copyrights and subject to lease; any person can make a picture and copyright it, and any exhibitor is free to lease a copyrighted picture or refuse to do so.

■ The respondent has lawfully exercised its right to sell its product to the best advantage and in such quantities and to such persons as it chooses. It neither has a monopoly and apparently not the ability to acquire one. The percentage of the pictures produced in the film rentals received have progressively declined during the period covered. The means and methods employed in marketing its leases of films to prospective customers are matters within the business judgment of a private producer of films and carries with it the legal right to bargain and negotiate as the respondent did. The method of negotiation which has been condemned by the Commission does not disclose a dangerous tendency unlawfully to hinder competition, nor does it create a monopoly. The findings are insufficient in law to support the conclusions of fact reached, and therefore the petition to enforce paragraph 2 of the order to cease and desist must be denied.

Petition denied.