**NATIONAL LABOR RELATIONS BOARD
v. HOPWOOD RETINNING CO., Inc.,
et al.**

**No. 393.**

Circuit Court of Appeals, Second Circuit.
July 12, 1938.

Kotzen, Mann & Siegel, of New York City (Abraham Mann, of New York City, of counsel), for respondent Monarch Retinning Co., Inc.

Daniel J. Byrne, of Ridgewood, N. Y., for respondent Hopwood Retinning Co., Inc.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The petitioner seeks enforcement of an order isued by it against both respondents pursuant to § 10(c) of the National Labor Relations Act (29 U.S.C. §§ 151 et seq., 160(c), 29 U.S.C.A. §§ 151 et seq., 160(c). Jurisdiction of this court is provided for by § 10(e), 29 U.S.C.A. § 160(e).

Charges were filed by the Metal Polishers International Union, Local No. 8 and the Milk Drivers Local No. 584, International Brotherhood of Teamsters and Helpers, charging the respondent Hopwood with certain unfair labor practices, affecting commerce within the meaning of the act.

May 24, 1937, by its Regional Director, petitioner issued a complaint and notice of hearing which was served upon the Hopwood Company. Respondent Hopwood is a New York corporation engaged in the collection, reconditioning and distribution of milk and ice cream containers. It is charged with refusing to bargain collectively with the Polishers and the Teamsters Unions, who were alleged to represent majorities in two separate units of Hopwood's employees. It is also charged that on March 31, 1937, Hopwood locked out and discharged all its employees, except clerical and supervisory employees, because of their concerted activities for the purpose of collective bargaining; that it had attempted to persuade the locked-out and discharged employees to withdraw from membership in the two unions and, by such unfair labor practices, it affected commerce within § 8, subds. (1), (3) and (5) of the Act, 29 U.S.C.A. § 158(1, 3, 5). The answer of Hopwood excepted to the jurisdiction of the Board and denied that it had committed unfair labor practices or that it had been engaged in the business described in the complaint since March 31, 1937.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, and Ernest A. Gross, all of Washington, D. C., for National Labor Relations Board.

A hearing was held, commencing June 7, 1937, and on June 9th the trial examiner granted a motion amending the complaint

so as to add as a respondent the Monarch Retinning Company, Inc., which was organized April 15, 1937 under the Laws of New Jersey. It was charged that when, on March 31, 1937, Hopwood discontinued its business in Brooklyn, N. Y., it transferred its machinery and processing business to the Monarch Company in New Jersey for the sole purpose of avoiding Hopwood's obligations under the act; and that Monarch in taking over the processing of Hopwood constitutes the same entity as Hopwood. Service of this amendment was made upon Hopwood's attorney, who, at that time was president of Monarch, and further hearings were postponed until June 18th in order that Monarch might prepare its defense and answer the complaint. On June 18th, Monarch appeared specially and moved to dismiss the complaint against it on the ground that it could not be made a party to an amendment to the complaint in the absence of any charge previously filed against it. This motion was denied. An offer was made to permit Monarch to cross examine the witnesses who had testified at the preceding hearings.

Monarch filed its answer and challenged the jurisdiction of the Board. Full opportunity was given to cross examine the witnesses thereafter called and to introduce testimony. Monarch appeared and was represented by attorneys on June 18th and 19th, when the hearings were concluded.

The Board ruled that Monarch was properly joined as a party. It found, with evidence to support it, that Hopwood was a New York corporation engaged principally in retinning and servicing milk and ice cream containers; that it employed about 190 production employees and 17 truck drivers and helpers and in 1936 its total business was $621,967.70, of which about 23% was derived from states other than New York. On March 31, 1937 Hopwood ceased the business of reconditioning containers and since has functioned only as the exclusive sales agency for Monarch. The latter company is performing all the reconditioning operations at its plant in Jersey City; it serves practically the same customers as were served by Hopwood and at least 77% of its business is derived from states other than New Jersey. It found that Hopwood locked out and discharged its production employees and truck drivers and helpers on March 31,

1937, because of their union membership and activity and to thwart union organization amongst the men and that their discharge constituted an interference with, restraint and coercion of its employees in the exercise of their rights provided for in § 7 of the Act, 29 U.S.C.A. § 157, and was discrimination in regard to hire and tenure of employment, thereby discouraging membership in the unions. It found that when Hopwood ceased processing operations, it organized Monarch for the purpose of avoiding its obligations under the act; and that, prior to the removal to New Jersey, it had attempted to compel its employees to return to work under individual contracts but refused to recognize the union. The Board found that the production employees and the truck drivers and helpers employed by Hopwood constituted two separate units appropriate for the purpose of collective bargaining and that the Polishers Union and the Teamsters were the duly designated representatives of a majority of the employees in each of the units and that Hopwood refused to bargain collectively with the two unions as the exclusive representatives of all its employees and thereby engaged in unfair labor practices within § 8 (1) (5) of the act, 29 U.S.C.A. § 158(1, 5).

The order to cease and desist forbade unfair practices and required affirmative action (a) in offering to Hopwood employees who were locked out on March 31, 1937, and who have not since that date received regular and substantially equivalent employment at the plant of Monarch, immediate and full reinstatement to their former or equivalent positions at the Hopwood or Monarch plants; (b) make whole said employees from any losses of pay they have suffered by reason of the lock-out; (c) bargain collectively upon request with the unions as the exclusive representatives of the employees in the unions; (d) inform in writing each of the employees who have entered into an individual contract with either Hopwood or Monarch that such contract was entered into pursuant to unfair labor practices and will be discontinued and not enforced; (e) to post appropriate notices.

Hopwood contends that it is not engaged in interstate commerce and that its business does not directly affect interstate commerce. It says it does not engage in commerce but merely performs a service. It refers to Federal Base Ball Club v.

National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357; Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290; United States v. Fur Dressers' & Fur Dyers' Ass'n, D.C., 5 F. 2d 869; and Smith v. Jackson, 103 Tenn. 673, 54 S.W. 981, 47 L.R.A. 416, but these cases are not applicable. Hopwood's trucks picked up and made deliveries of containers upon which work was to be done and transported them, in 23%' of its ·business in interstate commerce. Its business consisted of straightening the containers, the removal of rust and solder and retinning and resoldering. New bottoms and other parts were also supplied, all of which was included in the service charge. It also purchased used containers which it reconditioned and sold. It was clearly engaged in interstate commerce. Consolidated Edison Co. v. National Labor Relations Board, 2 Cir., 95 F.2d 390; National Labor Relations Board v. National N. Y. Packing Co., 2 Cir., 86 F.2d 98.

The evidence sufficiently supports the findings of the Board that the lockout was the result of union activities and was an attempt by Hopwood to discourage unionization. Prior to March 31 the Teamsters' Union had organized the helpers and truck drivers and there had been strife between the employees and Hopwood, involving a two-day strike and the discharge and reinstatement of some of the workmen. There was testimony that the president of Hopwood stated he would have nothing to do with the union. There was an organization meeting of the production employees on the evening of March 30, at which some of the employees· signed up with the Polishers' Union. Officers of Hopwood knew of this meeting and the president said he would close the plant "because some of this bunch went and joined the union last night". He closed the plant in the morning. The president denied this and said he closed the plant because he feared a sit-down strike and that his information came from several unnamed workmen and an unnamed policeman. This the petitioner held insufficient, on evidence which supports the board's finding. Moreover, counsel for Hopwood, and now president of the Monarch, testified that Hopwood would not sign any contracts with the union and that its position on March 31 and thereafter was the same. The union did represent the majority of the employees and as such was a proper agency for collective bargaining. § 9(a) of the act, 29 U.S.C.A. § 159(a); National Labor Relations Board v. Remington Rand Co., 2 Cir., 94 F.2d 862.

A contract was offered by Hopwood which was prepared by one Balleisen and was intended to be executed between the company and each workman individually and not as a collective agreement with representatives of the employees, as provided by the act. It provided: "The employees, or any of them, shall not and have not the right to demand a closed shop or recognition by the Employer of any union, and the Employer has the absolute and unqualified right to hire or discharge any Employee or Employees for any reason or for no reason and regardless of his or their affiliation or nonaffiliation with any Union."

While this provision allowed the employees the right to join the union, it denied them any right of collective bargaining and would allow the employer to discharge for any reason, one of which might be union activities.

On April 5, 1937, a circular letter was sent out to the employees by Hopwood urging them to return to work and to sign the agreement offered by the company, but stated that the company "does not intend to sign any contract with any union". This position was reiterated in another letter· on April 8, 1937, and in subsequent conferences. Thus the Board could find, as it did, that Hopwood maintained an attitude of refusal to bargain with unions as the proper representative of the employees and that this continued during the time of the lockout and after the plant was established in New Jersey. The Board could properly find that the contract offered was not made in good faith as an attempt to bargain collectively. Moreover, the Board properly found that the establishment of Monarch and the removal of the business to New Jersey was an attempt on the part of Hopwood to evade its duty of collective bargaining.

Monarch was formed on April 15, 1937 by the persons in control of Hopwood. Its machinery and equipment and about ,12 trucks were transferred to New Jersey at a cost charged to the account of Monarch; and on the date of the hearing it had paid only $2,000 on account. The capital stock of Monarch consisted of twenty no par value shares, nine (9) of

which were held by the attorney for Hopwood, who was its president, ten (10) by a vice president of Hopwood, and one (1) by an employee of the attorney. The president of Hopwood and members of its staff supervised the installation of machinery. The materials used by Monarch were paid for by Hopwood although charged to the account of Monarch. Hopwood continued its existence, functioning as the exclusive sales agency for Monarch. The record does not disclose that Monarch owned any other assets or had any other business operations. A vice president of Hopwood, although paid solely by it, spends about half his time working for Monarch, as do other officers. The foreman and clerical staff of Monarch were formerly with Hopwood. The Board properly found that "The Monarch Co. is but the alter ego of the Hopwood Co., operated for its benefit, and controlled by it."

The order also provided that the respondents "cease and desist from using the services of L. L. Balleisen or any other person for the purpose of evading their obligations under the act". Balleisen was the author of the contract which was offered to the men in trying to induce them to return to work. There is no provision of the Labor Act which would justify a disqualification of Balleisen or any other person from preparing an agreement for the employer to present to the employees in the attempt to bargain collectively under the act. His economic views or suggestions as to the terms of the proposed contract are of no concern to the petitioner. They may indeed be accepted by the employees after collective bargaining. The Board is without power to disqualify those who attempt such service. It is not the individual but the result, and whether or not there has been collective bargaining within the terms of the act, or at least an attempt to do so, is the test. This is to be determined by the intent of the employer to deal collectively with the employees as shown by his acts and the terms of the contract offered or accepted. The Board is without power to say what person may conduct the negotiations. This direction of the order to cease and desist will be modified.

The relationship between Hopwood and Monarch is of importance because both companies were made parties respondent before the Board. But Hopwood alone was found to have committed unfair labor practices. The Board nevertheless directed its order against both companies upon the basis that Monarch was the successor or alter ego of Hopwood. Monarch objects to the assumption of jurisdiction by the Board. Although the hearing began June 7th, Monarch was not served with the complaint until June 9th. The same trial examiner, without a charge having been filed with the Regional Director or the Board, proceeded to allow a so-called amended charge as against it on June 18th. The Board issued a complaint against Monarch on the theory that its authority to do so was not limited by the scope of the original charge against Hopwood.

Section 23 of the Rules & Regulations, Series I as amended, of the National Labor Relations Board, states that the hearing shall be conducted by "a Trial Examiner specifically designated by the Board, by the Chief Trial Examiner, or by the Regional Director". Monarch is not named in the order appointing this trial examiner nor was it charged with unfair labor practices at that time. Under § 11(1) of the Act, 29 U.S.C.A. § 161(1), any member of the Board or agent designated by the Board may conduct a hearing. Section 10(b) of the Act, 29 U.S.C. A. § 160(b), provides that whenever it is charged that one has committed an unfair labor practice, the Board may "issue * * * a complaint stating the charges in that respect". Art. II of the rules of the Board dealing with procedure under § 10 of the Act, provides that (1) if the charge is withdrawn the Regional Director shall withdraw any complaint based thereon; (2) the charge shall be filed with the Regional Director; (3) the charge shall be in writing; and (5) provides that after the charge has been filed, the Regional Director shall cause to be served upon the respondent a formal complaint stating the charges and containing a notice of hearing. This procedure is required as a prerequisite to the jurisdiction of the Board and the complaint issued and the subsequent hearing must be in accord with the charge in an attempt to prove or rebut such charges. The Board should be an impartial administrator and must ascertain if there were unfair labor practices as charged. The Board cannot use its own initiative in respect to charging unfair practices.

Since the ultimate order to cease and desist was issued against Monarch as well

as Hopwood, the former was entitled to a full fair trial consistent with procedure provided for by the provisions of the Act and the rules of the Board. These formalities were not followed as required. There was a service by way of amendment to the complaint on June 9th, although no charge had been filed or attached to the complaint; and the so-called amended charge of June 18th was merely filed with the Trial Examiner. The Board, however, contended that Monarch was the alter ego of Hopwood and therefore the corporate fiction should be disregarded. Chicago Mill & Lumber Co. v. Boatmen's Bank, 8 Cir., 234 F. 41, 45; Mennen Co. v. Federal Trade Comm., 2 Cir., 288 F. 774, 782, 30 A.L.R. 1120; Metropolitan Holding Co. v. Snyder, 8 Cir., 79 F.2d 263, 267, 103 A. L.R. 912. We may not consider Monarch a subsidiary; it is a distinct and separate entity. But we can and will regard it as an agency or instrumentality used to further the purposes of Hopwood's lockout, since Hopwood was found, upon substantial evidence, to have violated the provisions of the Act by its unfair labor practices and by its lockout, aided in the latter through its agent or instrumentality, Monarch.

The Board is, therefore, directed to vacate the order as against Monarch and to require only Hopwood to carry out the provisions thereof, even though the latter, where necessary to accomplish this, may be required to secure the cooperation of its agent, Monarch. Subdivision 4 will be stricken from the order.

As thus modified, the order of enforcement will be granted.