PRESS CO., Inc., v. NATIONAL LABOR RELATIONS BOARD (TRI-CITY NEWS-PAPER GUILD, et al., Interveners).

No. 7482.

GANNETT CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

No. 7484.

United States Court of Appeals for the District of Columbia.

Decided Dec. 9, 1940.

On Petition for Rehearing Feb. 14, 1941.

Supplemental Opinion Mar. 24, 1941.

Writ of Certiorari Denied June 2, 1941.

See 61 S.Ct. 1118, 85 L.Ed. ——.

RUTLEDGE, Associate Justice, dissenting in part.

Elisha Hanson, of Washington, D.C., for petitioners Press Co., Inc., and Gannett Co., Inc.

T. Carl Nixon, of Rochester, N. Y., for petitioner Gannett Co., Inc.

Charles Fahy, Robert B. Watts, and Mortimer B. Wolf, all of Washington, D. C., for respondent National Labor Relations Board.

Abraham J. Isserman, of Newark, N. J., for interveners.

Before GRONER, C. J., and STEPHENS and RUTLEDGE, JJ.

## GRONER, C. J.

In July, 1939, the National Labor Relations Board issued an order requiring petitioners, the Press Co., Inc., and Gannett Co., Inc., to cease and desist from engaging in certain unfair labor practices, to offer to Austin J. Scannell, John Wanhope, Henry E. Christman, and Raymond H. Mowers immediate reinstatement, with back pay, to the same or equivalent positions held by them when their connection with Press Co. was severed, and finally, to post the usual notice of intention to comply with the order.

Press Co. and Gannett Co. then filed in this court separate petitions for review. The Board answered each petition and prayed a decree enforcing its order.

In 1936, Press Co. was publishing two newspapers in Albany, N. Y., the "Knickerbocker Press" in the morning, the "Albany Evening News" in the afternoon. Its common stock was owned by Gannett Co., a corporation with its principal office in Rochester, N. Y. Three of Press Co.'s directors were also directors of Gannett Co., and Frank E. Gannett was president of both corporations.

In November, 1935, B. J. Lewis was employed by Press Co. as editorial director of its morning and afternoon papers. In May, 1936, A. J. McDonald became its treasurer and general manager.

Tri-City Newspaper Guild is a labor organization affiliated with the Committee for Industrial Organization. Its membership consists of editorial employees of newspapers published in the cities of Albany, Troy, and Schenectady. It was organized in 1933 or 1934, and included a majority of the editorial employees of Press Co., but not until March, 1936, did it seek a collective contract with that company. Negotiations continued until February, 1937. At that time the president of the Guild was Zoe B. Fales, an employee of the rival Hearst paper in Albany and the wife of Henry E. Christman, a reporter on Press Co.'s afternoon paper. Press Co. was represented in the negotiations principally by McDonald and Lewis, and in February, 1937, a tentative agreement was reached which McDonald agreed "to submit to Rochester". Before it had been acted upon by Press Co.'s directors, the Guild entered into an agreement with Press Co.'s Hearst competitor on terms less advantageous to employees. When informed of this, McDonald offered on behalf of Press Co. the same terms, which were refused. A little later Press Co. made an agreement more favorable to the Guild than the one entered into with the competitor.

In June, 1937, Press Co. sold its morning and Sunday circulations to the Hearst paper in exchange for the evening circulation of the latter. The Hearst paper abandoned the evening field, and Press Co. abandoned the morning and Sunday fields and continued its afternoon paper, with the name changed to "Knickerbocker News". This resulted in a necessary reduction of Press Co.'s employees from 514 to 356.

The selection of the survivors in the editorial department was left to Lewis. When the list of those retained was posted with a notice that all others were dismissed, the Guild passed a provisional strike resolution and through its committee demanded reinstatement of Hyde, Scannell, Wanhope, Christman, Jackson, Andrews, and Mohan. The Guild took the position that these men had been discharged because of sympathy for or activities in behalf of the organization. The New York State Mediator was asked by the Guild to intervene, which he did. Hyde repudiated the action of the Guild in his behalf. Press Co. offered to submit the question of discrimination against the others to arbitration by the mediator, but the Guild rejected this offer and filed charges with the Labor Board.

The Board issued its complaint against both Press Co. and Gannett Co., and charged unfair labor practices affecting commerce within the meaning of Sec. 8(1)

and (3) and Sec. 2(6) and (7)[1] of the National Labor Relations Act, including alleged discrimination in the discharge and refusal to reinstate Scannell, Wanhope, Christman, Jackson, Andrews, and Mohan. Subsequently the complaint was amended by including Mowers and Leonard, and by eliminating Mohan, who testified at the hearings that there had been no discrimination against him and he had not authorized the Guild to file charges in his behalf. The trial examiner found the charges sustained as to Scannell, Wanhope, and Christman, and recommended dismissal as to Jackson, Andrews, Leonard, and Mowers. Jackson and Leonard took no exceptions and were dropped from the proceedings, and in the final decision, concurred in by two members of the Board, the examiner's findings were sustained as to all the persons named except Mowers, as to whom they were overruled, and the order followed.

The grounds here urged by Press Co. are: (1) That the proceedings, findings, and order of the Board are repugnant to the due process clause of the Fifth Amendment of the Constitution; (2) that the order is an infringement of the freedom of the press; (3) that the Board was without jurisdiction because Press Co.'s operations did not directly and substantially affect interstate commerce; and (4) that the findings of the Board are not supported by substantial evidence.

### First. Due Process.

It is argued that the Board had prejudged the case. Two witnesses testified to announcements at a Guild meeting that the Labor Board had given assurances of an open-and-shut case. And at the hearing, the trial attorney said: "The Board's position is that both companies have violated the National Labor Relations Act."

In the final argument, counsel for Press Co. cited these instances to show that the Board had violated due process. The Chairman asked counsel whether he believed that he or either of his two associates was guilty of making such commitments, and upon the reply of counsel that it was unnecessary to answer the question, the Chairman said: " * * * you know that is sheer demagoguery for the benefit of the small audience to your rear."

And finally, the Chairman stated to counsel upon his inquiry as to how much time he had left: "You have four minutes if you think it will do you any good".

As to all of this, it is sufficient to say that there was no showing from which we can or should infer that either the trial examiner or the Board members had made statements showing prejudgment of the case. If any statements made by the prosecuting arm of the Board created the unfortunate impression that the case was foreclosed before it was begun, this was the result of those provisions of the statute which combine in the same agency not only the power to investigate, initiate, and prosecute, but as well the power to hear and decide. But responsibility for such matters is with the legislature and not with us. What is complained of as later occurring in the argument, may reasonably be considered as having resulted from the implications of counsel's remarks, and we know of no rule of judicial conduct applicable either to court or board which requires silence in the face of an imputation of dishonorable conduct.

### Second. Freedom of the press.

Petitioner's argument, that any legislative restriction of the authority of a publisher to discharge an editorial employee is an abridgment of the freedom of the press, was used unsuccessfully in Associated Press v. Labor Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, in which the Supreme Court distinctly held that there was no such constitutional objection to an act of Congress making it unlawful to discharge an employee for union activity. That is the charge here, and it raises an issue of fact which, under the rule in the cited case, the Board is competent to hear and decide.

### Third. Interstate Commerce.

The Board's findings of fact show that Press Co.'s afternoon newspaper had a circulation in excess of 45,000 copies, only 2,000 of which were circulated outside the State of New York; that 90 per cent of its raw material came from outside the State; that it is a member of the Associated Press and receives from and delivers to it news items for publication in the United States and foreign countries; and receives its syndicated articles, comic strips, and much of its advertising from outside the borders of its own State.

---

[1] 29 U.S.C.A. §§ 158(1) (3), 152(6) (7).

This is a sufficient finding that Press Co.'s operations affect interstate commerce under the rule announced by the Supreme Court in Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352, and in Labor Board v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014, in which it is said that the regulatory power of Congress over interstate commerce is not dependent upon whether the volume is great or small.

*Fourth. The question of substantial evidence.*

The Board has found that both petitioners interfered with Press Co.'s employees in the exercise of the rights guaranteed under Sec. 7 of the Act[2] and engaged in an unfair labor practice within the meaning of Sec. 8(3) of the Act[3] by discharging Scannell, Wanhope, and Christman, and by discriminating against Mowers in the conditions of his employment. We have, as we are in duty bound, carefully examined the more than one thousand pages of testimony to determine whether there is substantial evidence to sustain the Board's findings. As we have already seen, this controversy grew out of the surrender by petitioner Press Co. of the morning field in Albany and the publication thereafter of one paper instead of two. This obviously made necessary the dismissal of part of the editorial force. During the period when both morning and afternoon papers were issued, there had been 74 persons employed in that department. Twenty-nine were dismissed and 45 retained. Of those retained, 34 were members of the Guild and 11 were nonmembers. Of the 29 dismissed, 27 were Guild members and 2 nonmembers. In addition to this, the Board emphasizes the fact that among the dismissed Guild members were 6 men who were said to be then its officers and leading spirits, and all of this, the Board finds, was accomplished through the instrumentality of the editorial director, Lewis, who it says was known to have a bias against the Guild.

Lewis had been appointed editorial director in November, 1935. The Guild was then inactive. In order to inquire as to the background of the members of the staff, he called them singly into conference. One of those he talked to was Wanhope, then a reporter on the afternoon paper. Wanhope in his testimony says the conversation centered around the Guild. Lewis asked him why there was any need for it and expressed the opinion that the publisher could be relied upon to take care of his people. "His attitude was that men and women in The Press Company should get more through his [Lewis'] efforts as editor than they ever could get through a Guild". Lewis "likened the Guild to the hod carriers and bricklayers, and he did not think that professional men should stoop as low as to organize a labor union". Wanhope disagreed, and said that in his opinion the only way newspaper men could get anything was through a co-operative effort in a labor union.

Mowers testified that Lewis had once said that he had been able to secure some raises in salaries and that Mowers was entitled to one but might not get it, "because of the activities of that God damned labor union".

Scannell testified that, when he reported the belated account of one of the newspaper photographers for 168 hours overtime, Lewis asked how such an amount had accumulated without his notice, and added— "The God damn labor union is wrecking this newspaper".

Hyde once heard Lewis speak of members of the Guild as "Guild rats". The occasion is not clear, but the remark seems to have been connected with the scurrilous article written about Lewis, published in the Guild magazine, and sent to him anonymously and with the words "Read that, you skunk" typed on it. Later the Guild met to consider the matter. There was testimony that Miss Scott, the author, and Scannell opposed an apology and that finally a resolution repudiating or disclaiming responsibility for the article was adopted.

Miss Scott, the author of the article, testified to conversations she had had with Lewis, in which he stated he had never before been on a newspaper where the Guild was a factor and that as a pro-

---

[2] "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C.A. § 157.

[3] "It shall be an unfair labor practice for an employer—* * * (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C.A. § 158(3).

fessional newspaperman he could not quite bring himself to see the place of a trade union in the newspaper industry, and he thought the members of the Guild were making a mistake.

One or two other witnesses said the general impression of those on the paper was that Lewis was out of sympathy with the Guild, and this doubtless was true. But giving due weight to the normal and natural effect of his statements, we are nevertheless of opinion that, without more, the Board was not justified in finding that *alone* they constituted an unfair labor practice. The labor law does not prohibit the right of opinion on the part of the employer, nor the expression of it. Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126; Labor Board v. Union Pacific Stages, 9 Cir., 99 F.2d 153, 178, 179; Jefferson Electric Co. v. Labor Board, 7 Cir., 102 F.2d 949, 956; Labor Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 786; Montgomery Ward & Co. v. Labor Board, 7 Cir., 107 F.2d 555, 559; Humble Oil & Refining Co. v. Labor Board, 5 Cir., 113 F.2d 85, 92; Continental Box Co. v. Labor Board, 5 Cir., 113 F.2d 93, 96, 97; Midland Steel Products Co. v. Labor Board, 6 Cir., 113 F.2d 800, 804; Martel Mills Corporation v. Labor Board, 4 Cir., 114 F.2d 624, 633, 634; Labor Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796, 802, 803; Labor Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, 913.

Before oral statements of an employer may be held to be an unfair labor practice, it must appear that they interfered with, restrained, or coerced employees in the rights guaranteed by the Act, that is to say, the right to join labor organizations, to bargain collectively, and to engage in concerted activities. But nothing that Lewis is quoted as having said, nor the surrounding circumstances, conveys the idea that the employees had anything to fear because of their union activities. The comments arose either in a frank exchange of views with his staff; with reference to the effect of the Guild's contract on the financial operation of the newspaper; or as a result of a natural outburst of anger at being cruelly caricatured in the Guild's paper. No witness suggests that there was at any time any use of or even the suggestion of the economic threat of discharge. The Board bases its finding of coercion entirely on these remarks of Lewis.

There is no finding of hostility or coercion on the part of any other executive.

But the question of carrying out the Board's order of reinstatement depends, in the circumstances we have here, not so much upon the question of coercion or lack of coercion, as upon whether Lewis purposely availed himself of the opportunity to reduce his staff in order to relieve himself of the presence of certain officers and members of the Guild whose union activities he personally did not relish or approve. That question is the real bone of contention in this case. There is, it is true, no direct evidence that he did, and the Board's affirmative conclusion is grounded on the inference to be drawn from Lewis' bias against the Guild as shown by his above quoted statements, his asserted familiarity with the activities of Guild members, his failure to testify, the excessive proportion of Guild members selected for dismissal, and a rather casual appraisal of the relative merits of employees.

If, in this state of the record, Lewis had gone on the witness stand and testified that he had exercised the right to discharge Scannell, Wanhope, and Christman because he was able to retain other men who were their superiors in the work of the newspaper, or because of any dereliction on their part in the discharge of their duties, or that in making his selections he had weighed the relative merits of those whom he retained and those whom he discharged and had based his selection on the ground of merit alone, the case would have a different aspect. But since he refrained from testifying at all, we are unable to say that the factor of Guild activity, which the Board considered the real cause, can be said to be without support in the evidence.

Petitioner contends that freedom of the press permits a publisher to withhold the basis of his selection of employees, and prohibits any unfavorable inference from silence on this subject. It is not easy to see how a free press is either protected or promoted by the publisher's refusal to testify in denial of union discrimination and in frank explanation of the grounds for selection and dismissal of editorial workers any more than in the case of other workers. Here, we think, the refusal, coupled with the inferences properly deducible therefrom, justified the Board's action. Cf. Montgomery Ward & Co. v. Labor Board, 7 Cir., 107 F.2d 555, 559;

Labor Board v. Remington Rand, 2 Cir., 94 F.2d 862, 871, certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; Labor Board v. Mackay Co., 304 U.S. 333, 346, 347, 58 S.Ct. 904, 82 L.Ed. 1381; Interstate Circuit v. United States, 306 U. S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610.

The case of Mowers is on a different footing. He was among those retained in July, and from then until his resignation at the end of October, he was assigned to handle principally the school page, the daily broadcast, the church page, and obituaries. The "rewrite" work which he had formerly done was assigned to Brock, also a member of the Guild. His name was added to the complaint by amendment at the hearing, on the theory that petitioners had, because of his union membership and activity, ordered him "to perform such onerous duties, and to assume positions so inferior to that with which [he] had been accustomed" that he was forced to resign. The trial examiner found the evidence insufficient to show discrimination against him within the meaning of the Act. The Board held, on the contrary, that in view of Mowers' previous experience and satisfactory record, the change in his duties was intended to demean his services and induce his resignation. His salary continued as formerly at $55 a week until his resignation. When two papers were published, his work was to accept stories for the afternoon paper by telephone from reporters and rewrite them for publication. He also did some "special feature work" for the Sunday edition. His testimony shows that his work was appreciated and frequently commended by Lewis and that up to the time of his resignation his relations with Lewis continued friendly. He likewise testified that at no time had he made any complaint to Lewis of his treatment or suggested to or requested of him any change in his assignments, but that he resigned because he found it impossible to carry on as a music editor of the Saturday paper, and this, together with the routine which had gathered on his desk, induced him to believe that he had better get out. Mowers' own statements show that the school page and the church page are important features of a newspaper, and it would appear to us, as a matter of common knowledge, that the two daily news broadcasts, the preparation of which, as he testified, took the greater part of his time, are as important in this day and age as any feature of a newspaper.

He resigned to accept a position with the State of New York at practically the same salary.

We have, therefore, a situation in which the employee, though well known to Lewis as an active member of the Guild, was retained with a change of duties, but without diminution of salary; he at no time complained to any head of the paper; and prior to his resignation he was offered and accepted another position. Considered in these aspects, we think the only rational conclusion is that Mowers' action in resigning was due to the fact that he placed his personal inclinations for a particular character of work ahead of what the management considered the needs of the paper. Certainly, he was in much better position than the Board to know the real facts, and yet from the beginning of his testimony to its conclusion he never once said that his association with the Guild was the occasion of the change. Nor did he say anything else from which that conclusion should be drawn. Some one had to undertake the work assigned to him, and the Board has not found that less experienced men than he were assigned to do his previous work. In this state of the findings, it is difficult to see wherein lay the discrimination. That Mowers believed his particular talent for music and in other fields was not recognized and for that reason he was discontented, is obvious, but it does not prove, nor does he say, that his assignment to other duties was intended to coerce his resignation. It is impossible to read his testimony and reach the conclusion that at any time he attributed his lack of congenial work to a purpose to get rid of him—much less a purpose actuated by his union activities. The vacancy created by his resignation was promptly given to another member of the Guild.

In this state of the record, we are unable to find any evidence to sustain the Board's finding that, "in view of Mowers' previous experience and satisfactory record," the material alteration in his duties can be assigned only to an intent to demean his services and induce his resignation. The Board does not say that Lewis did any of these things or authorized them to be done, and every fair implication to be drawn from the evidence is to the contrary, for Lewis appears always to have been his friend and his most favorable critic. But counsel for the Board argue that this conclusion is justified by what they say was

a "display of hostility," but again there is no evidence of any hostility and no claim by Mowers to that effect. Nor are we able to find a precedent for this action of the Board in any of the cited cases. In Labor Board v. American Potash Corporation, 9 Cir., 98 F.2d 488, 493, certiorari denied, 306 U.S. 643, 59 S.Ct. 582, 83 L.Ed. 1043, a foreman at 80 cents an hour was suddenly demoted to helper at 50 cents, and he was replaced by a man of less experience. In Clover Fork Coal Co. v. Labor Board, 6 Cir., 97 F.2d 331, 335, the resignation of the employees was induced by an employer-instigated demonstration of other employees, who refused to work with the union men. In Fort Wayne Company v. Labor Board, 7 Cir., 111 F.2d 869, and in Kansas City Power Co. v. Labor Board, 8 Cir., 111 F.2d 340, the Board ordered the restoration of two employees to their former positions because the transfers were found to have been based on union activities. Each of the men was active in union organization and had met the antagonism of the employer against unions. In the former case, the transfer involved loss of pay. In the latter, the transfer was from one plant to another so as to separate the organizer from the body of men he was organizing. Nothing comparable with any of this appears here. We are, therefore, of opinion that the Board's order in respect to Mowers is not sustained by the evidence and should be annulled.

The Board found that Press Co.'s Rochester office was kept "currently advised by Lewis of the Guild's activities and plans, and of the actions of individual Guild members." The testimony cited to sustain this finding is that of Lewis' private secretary, Alice Raymond, who was called as a witness for the Board. The manner in which her evidence was secured reflects no credit upon the Guild. Miss Raymond had been let out in July, in the reduction of the force, and shortly thereafter Christman came to her and asked her if she would transcribe some of her shorthand notes which he showed her, but this she refused to do, and when she asked him where he had got her notes, he refused to tell her. Subsequently counsel for the Board sent for her, and she answered his questions about the nature of Lewis' correspondence. She was then subpoenaed and testified that it was Lewis' habit, after Guild meetings, to write to Rochester; that the general nature of the letters was "what went on at the meetings and what the Guild was planning"; that Miss Scott and Scannell were mentioned in the correspondence; and that the letters to Rochester were much more frequent before the contract with the Guild than afterwards. The Board's attorney did not ask her to read her notes, but relied upon her recollection of what they contained, and her testimony of the purport of the letters shows no more than that the correspondence contained references to the activities of the Guild and two or three of its members. The reference to Miss Scott, the author of the "skunk" article, is not significant, since she was retained in the new set-up with an increased salary, and Miss Raymond's recollection of the reference to Scannell tends to justify Lewis' action in dismissing him, since it related not to union activity, but to his failure to comply with Lewis' instructions in the work he was given to do. The reference to Wanhope is unexplained, except that Lewis regarded him as a "red". The Board's finding on this evidence is that "respondents have kept under surveillance the meetings of the Guild and the activities of its members" and thus violated Sec. 8(1) of the Act, 29 U.S.C.A. § 158(1).

This is the equivalent of saying that surveillance ipso facto violated the law, and the Board relies upon a long list of cases to sustain such a doctrine. We have examined the cases relied upon, and we are unable to say that any one of them unqualifiedly so holds, and a recent decision in the Ninth Circuit[4] is to the effect that surveillance, unaccompanied by interference, coercion, or restraint, is not an unfair labor practice. However, this may be, we have reached the conclusion that the Board's order to cease surveillance may be sustained, because there is evidence that on the day following the Guild meetings Lewis was in possession of detailed information concerning what went on at the meetings and what the Guild was planning, and because there is further evidence (not referred to by the Board) that during a number of conferences Lewis assured employees that "they [the employers] were well apprised of what was happening in the Guild". Taken in conjunction with Lewis' failure to explain how he acquired his information, this evidence tends to show that he kept himself informed by some means

---

4 Labor Board v. National M. B. Co., 105 F.2d 652, 657.

of the Guild's plans, and this we think may be called surveillance. In any case, the substantiated finding that Lewis later dismissed employees for their Guild activities supports the conclusion that the knowledge thereby acquired did actually interfere with union activity.

*Fifth. Was Gannett Co. a proper respondent?*

This question is raised by the separate petition of Gannett Co. The complaint, as we have seen, issued against both corporations, and the Board has found "on the basis of unified ownership, management and control" that Gannett Co. acts for Press Co. and is an employer of the employees involved in the case. The order is likewise directed in all its terms against both corporations.

The facts found by the Board and supported by the evidence show that Press Co. was a corporation organized and existing under the laws of New York; that Gannett Co., Inc., also a New York corporation, owned all of Press Co.'s common stock and half its preferred stock, but none of its bonds; that the three highest offices in each corporation were held by the same men, Gannett being president of both companies, Tripp vice-president, and Cruickshank secretary; and that these three comprised a majority of Press Co.'s directors. The Board's report shows that Gannett Co., Inc., owns the entire capital stock of some newspaper corporations and a majority of stock in a number of others. Each of the papers, so far as we are able to determine, is owned and operated by a separate corporation. Frank E. Gannett is president of each one, and controls its policy. There is unquestionably a close community of interest between the different papers, but there is no testimony that the Gannett Co. ever exercised control of the internal operation of the newspaper published by Press Co. There is positive evidence to the contrary. The finding of the Board as to exchange of views between the officials of the two companies has reference to various conferences of executives of all the newspapers "for group discussions" "of their common problems". Counsel for the Board calls particular attention to the activities of one Atwood, whom the Board describes as "the associate director of the Gannett newspapers". The references by counsel to the testimony of witnesses in relation to Atwood's activities show that he would advise on editorial and advertising policy, but only in one instance is he referred to in relation to any matter connected with this case, and that incident occurred at the time of the abandonment by Press Co. of the morning newspaper field. On that occasion he is said to have "collaborated with" Lewis in selecting the list of employees to be retained. But the Board does not stress this incident, obviously because there is no claim that Atwood was hostile to the union. And McDonald, general manager of Press Co., testified, and his testimony is uncontradicted, that Atwood had no power in the matter. This, in turn, is confirmed by findings of the Board that Lewis, Press Co.'s editorial director, was alone the responsible agent in the transaction.

A careful examination of the evidence shows a complete absence of any which ought to be accepted by a reasonable mind tending to show that Press Co. was not self-governing. Gannett was its president, and with Tripp and Cruickshank, its other directing officers, resided and had offices in Rochester, and its policies were determined there. The statement of witnesses that various matters were referred by the local officers of Press Co. "to Rochester" for decision, is certainly more consonant with the idea that the references were to its own officers there rather than to the Gannett corporation. And yet the Board rejects this natural and reasonable conclusion because of the "dual capacities of the policy-making executives and the realities of the relationship", whatever that may mean. Unless, therefore, the community of interest of which we have spoken, plus advice and assistance when needed, is enough to wipe out and destroy the corporate structure, the Board's conclusion that Gannett Co. was equally responsible in its corporate capacity for the acts done by Press Co. in its corporate capacity, cannot be sustained. Of course, it is true that Gannett Co., as the owner of all the voting stock of Press Co., was in position to dictate its action in any corporate matter, but until legislation is adopted outlawing holding companies, this alone, in circumstances like these, is not sufficient to annul corporate identity; and this case, after all, concerns only the single question whether, in the reorganization of its newspaper personnel and the necessary reduction in its editorial staff, Press Co. violated the National Labor Relations Act, and our holding that it did follows the reasoning of the Board and its argument in this court to sustain that rea-

soning. And nothing—certainly nothing substantial—is offered to show that the Gannett Co. itself aided and abetted in that result.

In its opinion the Board again and again places on Lewis sole responsibility for discrimination between Guild and non-Guild members. Thus, in summing up the reasons for its finding, the Board says: " * * * the selection of the persons to be discharged was delegated to B. J. Lewis, who was, as we have found, actively opposed to the Guild. Moreover, the duty of selection was committed to Lewis despite the respondents' full knowledge of Lewis' Guild animus, which had been the subject of previous complaint by the Guild. * * * although the duty of selecting the restricted staff devolved on Lewis alone, and he alone was in a position to testify as to the basis upon which his selection was made, he was not offered as a witness and the natural inference to be drawn from his known bias against the Guild and the excessive proportion of Guild members selected for dismissal was allowed to stand without contradiction."

Moreover, in the brief filed in this cause counsel for the Board say under the heading—"Lewis' Sole Discretion in Selecting Employees for Discharge"—that Lewis had displayed bias against the Guild, and that Press Co. knew of this bias and upon complaint had substituted McDonald, vice-president and general manager of Press Co., in Lewis' place as negotiator at the time the contract between Press Co. and the Guild was made, and yet, said the Board, when the necessity of selection arose because of the reduction in staff, Press Co. vested in Lewis absolute discretion to choose the editorial employees to be retained. The findings of the Board in these respects we have sustained, and both the Board's conclusion and our approval are clearly predicated on the fact that Lewis, Press Co.'s editorial director, was alone responsible for the interference with Guild activities. A careful inspection of the record shows unmistakably that the unlawful acts charged here were provable only by a showing that Lewis, Press Co.'s editor, was responsible for them, for there is no evidence of animosity on the part of anyone else, and the proof offered by the Board was directed, first, to showing through various statements made by Lewis that he was opposed to the Guild in the newspaper profession and to having it in an organization

of which he was the head and, second, that the unlawful discrimination which ensued was the act of Lewis alone. From all of this the Board properly, as we hold, drew the inference that the unlawful discrimination was the result of Lewis' personal animosity. In this view, it would seem to us hardly fair, first, to hold Press Co. guilty in delegating to Lewis sole power to select the employees for dismissal, coupled with the exercise by Lewis of the power, and then to hold, in order to reach Press Co.'s parent, Gannett Co., that the latter was equally responsible on the wholly opposite theory that the unlawful act was not that of Lewis alone, but was shared by Atwood, an employee of the Gannett Co. who stood by and saw it done.

Sec. 10(c), 29 U.S.C.A. § 160(c), authorizes an order against a person (corporation) only if the Board finds that person to have engaged in unfair practices. There is, as we have seen, no evidence on which to base a finding that Gannett Co. itself participated in any such practices. Hence its responsibility, if any, must we think rest, if it is found, on an agency relationship with Press Co. Ownership of stock and identity of officers by themselves do not create the relation. Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487. There must appear in addition such control by the parent as to show that the subsidiary is being used as its instrument. Chicago R. Co. v. Minneapolis Association, 247 U.S. 490, 500–502, 38 S.Ct. 553, 62 L.Ed. 1229. Press Co., as we have seen, was a separate legal entity, and whatever may have been the motives leading to its creation, it still retained its identity for legal proceedings. Peterson v. Chicago, R. I. & P. R. Co., 205 U.S. 364, 392, 27 S.Ct. 513, 51 L.Ed. 841; People v. American Bell Telephone Co., 117 N.Y. 241, 22 N.E. 1057; American Cyanamid Co. v. Wilson & Toomer F. Co., 5 Cir., 51 F.2d 665, 670. In the latter case it was said: "As a rule, one who contracts with a corporation must look to it alone for performance. The ownership by defendant of all the stock of the phosphate company did not merge the corporations, nor did the having of the same officers and offices end the corporate activity of either or by itself make one a mere agency or instrumentality of the other."

And see also, Majestic Co. v. Orpheum Circuit, 8 Cir., 21 F.2d 720, 724, and the cases cited on this rule. The well-known exception to the rule is stated in Chicago

R. Co. v. Minneapolis Association, supra,—that a court will not permit itself to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.

Here we have an active solvent corporation exercising its charter powers in the normal and ordinary way and with a full staff of officers and directors with power of control. There is no evidence in the case, nor does the Board suggest, that its corporate entity is a fiction or that it should be disregarded in order that justice may be done. Its employees look to it and not to the Gannett Co. for the performance of its contract with them. For violation of its duties or obligations, it should be and is now being held responsible, and there is not even a suggestion in the record that a judgment against it will not be effective to that end. The Gannett Co. participated in the wrong complained of only in failing to assert its corrective powers after the event, but that is not enough to justify holding it directly responsible for the act itself. Certainly we are referred to no case which goes so far. Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, in which the order issued against the parent and its subsidiary companies constituting one integrated system employing 42,000 employees under one general management, is vitally different. Nor is the case like Labor Board v. Lund, 8 Cir., 103 F.2d 815, in which the sole stockholder had personally interfered with unionization; or Labor Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, in which the respondents actually employed the men, although the work was done for a subsidiary; or Labor Board v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97; Id., 2 Cir., 104 F.2d 302, where there was an attempted evasion of the Act by shifting ownership from one corporation to another.

In Labor Board v. Hearst, 9 Cir., 102 F.2d 658, 663, the court enforced an order against the immediate employer and against parent corporations as well. "Because of the unified control," says the opinion, "the only way of effective prevention of the unfair labor practices, is to compel all respondents to cease and desist the unfair labor practices. All act 'directly or indirectly' for Hearst Publications, Inc., the nominal employer here, which brings them within the definition of 'employer' which is included in the term 'person.'" The Board's findings (2 NLRB 530, 533) showed an intricate system of corporate structure and direct control over the immediate employer. Here the evidence wholly fails to show control, active or otherwise, but on the contrary on the issue in question shows that Press Co., acting through its own editorial director in the discharge of his official duties, did the wrongful acts, and distinguishes the Hearst case on that ground.

One other matter has been brought to our attention. The order requires Press Co. to pay over to relief agencies any amounts paid in the interim to the employees discriminatorily discharged. The Board contends in its brief that this part of the order is a valid exercise of the Board's discretion. On this they are now foreclosed by Republic Steel Corporation v. Labor Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——.

It follows that the order of the Board must be modified. The name of Gannett Co. must be stricken. Paragraph 1(a), directed against discrimination by discharge, and paragraph 1(b), against surveillance, have support and should remain. But, as there was no evidence of other coercion, restraint, or interference, 1(c) should be set aside.[5] From paragraph 2(a), the name of Raymond H. Mowers should be stricken, and 2(c), requiring back pay for Mowers, should likewise be set aside. From paragraph 2(b) the concluding language, "and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects;" must also be stricken. As so modified the order will be enforced.

It is so ordered.

RUTLEDGE, Associate Justice (dissenting in part).

I concur in the conclusions reached by the majority so far as they hold that the orders of the Board should be sustained. In some respects I regard the facts shown by the record not only as sufficient to sustain these conclusions, but also as more

---

[5] See Memorandum on petition for rehearing with reference to paragraph 1(c), 118 F.2d 954.

strongly supporting them than the majority's opinion indicates. I agree that the order must be modified by eliminating the provision for reimbursement of relief agencies.

But I dissent from the view that the orders of the Board should be modified in other respects. The most important point of difference relates to the conclusions with respect to the holding company, Gannett Co., Inc. In my opinion the evidence clearly established that it dominated and controlled the Press Co. in its employment relations and in other respects; that it was guilty of unfair labor practices toward the complaining employees; and that, under the circumstances of domination shown in respect to these practices, relief was required against Gannett Co., Inc., if it was to be fully or perhaps at all effective. These and other issues are intertwined in the evidence, and some further statement of it than has been made is necessary for presentation of my views.

I. Press Co. is an operating unit in a highly integrated and extensive corporate system. Gannett Co., Inc., is the holding corporation. It also publishes two newspapers. There are some fifteen other operating subsidiaries. In at least five, including Press Co., Gannett Co., Inc., holds 100% of the voting capital stock. It holds or controls from 50+% to 93.22% of the voting stock in the other subsidiaries. Bonds and preferred, nonvoting stock have been largely distributed to the public. Frank E. Gannett holds more than 98% of the voting stock of Gannett Co., Inc. Each corporation has a board of directors, but Gannett, Frank E. Tripp and H. W. Cruickshank or some combination of two of these three constitute a majority in the boards of eleven of the subsidiaries, including Press Co. They also are on the board of the holding company, which has four other members. Gannett is president of the holding company and of thirteen of the subsidiaries. Tripp is an officer of the holding company and of eleven subsidiaries, and Cruickshank of the holding company and of thirteen subsidiaries. The lines of legal control of the system are therefore well concentrated within the hands of these three, and in no place more securely than with respect to Press Co. By virtue of his ownership of substantially the entire voting stock of Gannett Co., Inc., and its ownership of all the voting stock of Press Co., Gannett is of course the dominant figure in the trio, in the chain, and in each of its links, including Press Co.

For some purposes, such an integration of power and identity of interest would be sufficient in itself to justify or require identification of Press Co. with Gannett Co., Inc. But the commonly repeated dogma is that something more than identity of share ownership, voting control and dominant personnel in interlocking directorates must be shown in order to wipe out the segregation of legal relations which incorporation under other circumstances provides. If so, the concentration of legal controls was matched here by one of virtual or actual controls.

In important respects, of course, each corporation went about its own business. Each had its own subscription lists, its own local advertisers, its own staff. For some purposes the particular unit's relation to the chain was unimportant and to that extent it may be assumed that the formal separate grouping of legal liabilities—and rights—would be effective substantively.

But in other and, for present purposes, more important respects, the units were not independent—they were rather merely links in the chain, parts of the entire system, each connected with the other and operated as parts of the whole. There were periodical "conferences" at Rochester, the headquarters of Gannett Co., Inc., concerning business policy, editorial policy and publishing problems for the entire "Gannett Group." It had a uniform system of handling advertising, and apparently a common advertising agency. The different member papers exchanged services and adopted services of the central Gannett offices without charge. Editorials were sent out from the central Rochester offices to all chain papers and generally were published by them, in some instances optionally, in others apparently as "must" editorials. At least one airplane was used to gather news for the member papers. A "guidebook" was sent to all newspapers in the "Group" to achieve uniformity in style, make-up, etc. A chain "house organ," "the Gannetteer," was distributed throughout the chain and bore the label: "Published by the News and Editorial Office of the Gannett Newspapers." Control of financial policies also was exerted from Rochester. Instances could be multiplied, but these show sufficiently that in important business respects the chain was operated as a chain, not as disconnected links.

It is said that this has no significance other than would pertain to similar activities carried on by corporations independently owned and controlled. But the very essence of the philosophy which dictates that the formalistic segregation of legal relations be disregarded is that the foundation for it has been destroyed by the conjunction of two things: (1) identity of legal controls in the hands of the same persons or interests, and (2) identity of actual, operating control exercised to such an extent that in practical effect a single enterprise results. When to identity of stock ownership and legal voting power is added a failure to observe in actual operation the separations formally established by the distinct incorporations, their distinctiveness disappears if otherwise the policy of the law will be defeated in respect to the particular matter in issue. So in this case, as shown by the instances stated and others, the lines of corporate integrity have been blurred in many respects and wiped out in others.

However, general domination of one corporation's affairs by another may not require that the legal and formal segregation be ignored in respect to a particular matter. The fact that there has been commingling of activities in many respects does not always require that in others the separation be disregarded. When, however, the commingling not only is general, but relates to the very matter in issue, and the effect of maintaining the separate grouping of rights and liabilities would be contrary to some paramount policy in respect to that matter, incorporation affords no escape from the enforcement of the policy. The policy of maintaining corporate formal integrity gives way to the stronger one presented by the particular issues. In the present case this means that the holding company is to be held accountable, if the failure to maintain the corporate segregations relates to and has substantial effect upon the labor relations of Press Co. and its employees in producing the unfair practices complained of, and if a failure to take account of that fact would defeat or impair the policy of the Wagner Act.

It is exactly in respect to the labor relations of Press Co.—and other subsidiaries—that the record discloses the clearest evidence that the lines of legal and business control separating Gannett Co., Inc., and Press Co. were ignored. All the Gannett newspapers negotiated together a uniform wage cut of 10% during the early years of the depression. Such simultaneous uniformity among so many "independently" controlled companies would be a remarkable coincidence. McDonald, general manager, treasurer and director of Press Co., testified that a uniform policy of employment was "universally adopted by all our papers as a result of an order from the general manager." The general manager referred to as the author of the order was Tripp, who occupied that position with Gannett Co., Inc., not with Press Co. In a general conference of managing editors Gannett expressed the view that "the Wagner Act, passed to avoid labor disputes, has failed." He discussed labor policies in some detail, stating that he was not opposed to the Guild, but was discouraged by some developments, such as a tendency of the Guild to lessen the interest of newspapermen in their work and to make the capable suffer for the deficiencies of the incapable, the possibility of a closed shop and fears that increasing demands on wages and hours would threaten the lives of many papers. That these views had more than merely academic effect is shown by the remarkably similar, but much more emphatic, statements made by Atwood, Lewis and other executives in the long course of negotiations between Press Co. and the Guild. Gannett and Atwood were more conservative in their statements than Lewis, who made the covert hostility open and unreserved. But all of them were concerned that the Guild should devote itself primarily to ethical standards, not to the workers' economic interests, all expressed the view that unionization was beneath the dignity of editorial employees, and all kept close watch upon the Guild and its members. Atwood and Gannett, chiefly the former, were the persons to whom Lewis made his periodical reports recounting the results of his surveillance of the Guild. It is clear, therefore, that the views expressed by Gannett in these conferences, and reflected by Atwood and Lewis, were intended and had effect as a chainwide policy. They were not reached and executed by each corporation independently and through its own officials acting without influence and control from the system. In the execution of the system's uniform policy, Gannett was the real power, but Gannett Co., Inc., was the principal instrument, the key link in the complex chain. Through it, actual and operating, as well as legal and formal, control over Press Co. and its affairs was exercised.

Although this is shown by many facts, it appears most clearly, even conclusively, by the part which Atwood played. He is the incontrovertible connecting link between Press Co. and Gannett Co., Inc., and in fact between Press Co. and the chain, as well as its dominant figure, Gannett. Atwood was "associate editor" or "Editorial Director" of the Gannett Newspapers. He had no official position with Press Co. His only connection was with Gannett Co., Inc., which paid his salary and prescribed his duties. What he did, therefore, must be ascribed to Gannett Co., Inc., if it is to be given official effect. Unlike some others, he had no ambiguous official situation. He was connected with one, and only one, corporation. He could not alternate at will between his capacity as an officer of Gannett Co., Inc., and a similar capacity as an officer of Press Co. He either acted officially and exclusively on behalf of the holding company or over an extended period was engaged constantly in business activities which were entirely outside his official duties and the corporate affairs of his employer. It cannot be assumed that departure so gross, constant and long-continued would be tolerated, if what he was doing was none of his master's business. On the contrary, the conclusion is inevitable that his corporate employer knew of, assented to and in fact directed his intervention in the affairs of Press Co. By doing so, it made them its own.

A full record of Atwood's participation in the Press Company's business cannot be given here. He was active constantly, almost daily, and over a long period of years in its affairs, whether they involved business matters, editorial policy or labor problems.

He consulted with Eddy, managing editor of the Press for twelve years, "almost daily" on salaries, purchase of features, editorial management, use of "Rochester" editorials, etc. Some of this took the form of "instructions" or "directions," and Eddy understood it as such. He informed Eddy of his promotion to the position of managing director. Hyde, managing editor of the News for four years, had the same frequent consultation with Atwood, received numerous memoranda from him on how to conduct his work, customarily told him his plans, and testified that there were only two instances in which he "overruled Mr. Atwood and *was permitted* to proceed." (Italics supplied.) Miss Raymond, secretary successively to Eddy, Hyde and Lewis, testified that they maintained constant communication with Atwood. Supervision so close, sustained and authoritative hardly can be accepted as constituting merely friendly "counsel," "advice" or "suggestion."

But it is in relation to Press Company's labor relations and problems that Atwood's intervention was most constant and authoritative, during the period covered by its negotiations and controversies with the Guild. His activities may be summarized by saying that he had a hand, in my judgment a controlling one, in nearly everything which Lewis did, as well as other matters. It is upon Lewis' conduct, principally, that the majority rely in finding that Press Co. was guilty of unfair labor practices, requiring that relief be given by the Board. In my judgment the facts show that Lewis and Atwood worked hand in hand constantly and throughout the period of controversy. They show further, in my opinion, that of the two Atwood had the superior power.

Atwood was the person to whom Lewis sent his weekly reports of the results of his surveillance of the Guild, except in the rare instances when he reported to Gannett. Lewis kept Atwood informed concerning the Guild's meetings, what occurred in them, what it was planning, who joined and who refused to join, what he thought about its more active members, and many other matters. The function of these reports could have been only to enable Atwood to keep close tab on the Guild and Press Company's relations with it. Neither an independent executive nor a spy reports with such regularity and thoroughness to one who is merely a friendly outsider, in order to secure from him kindly, but unauthoritative "counsel" and "advice." The conclusion is irresistible that Lewis reported to Atwood because he was required to do so and because Atwood was required not only to receive but to act upon these reports when action became necessary. The true relation between the two men is disclosed, perhaps unconsciously or merely from habit, by the fact that Lewis always addressed Atwood in these reports as "Dear Boss." Atwood was thus directly a party to Lewis' surveillance of the Guild, and since the reports were made to him, he was the more authoritative party. If Lewis was guilty of surveillance, Atwood was equally guilty of it.

These facts take on greater significance and conviction when it is recalled that it was Atwood, not McDonald, Press Company's "policy-making official," who aided Lewis in making up the list of editorial employees who were to be retained after the merger, and therefore in selecting those who were discharged. Atwood thus also had a hand directly in the final act which constituted unfair discrimination against the Guild and its members. He was the one who informed Hyde of his discharge at the time of the merger. That his participation in the surveillance and the discriminatory selection was not mere casual and advisory intervention in Press Company's business appears both from the nature of these acts and from other facts. During the long negotiations with the Guild, Atwood and Lewis wrote to each other almost daily. Atwood took an active part in these negotiations. He attended nearly all of the meetings with the Guild leading up to its agreement with Press Co. In these he spoke for the management, not merely as an "adviser," but also as one having authority, and he was understood by Guild members as speaking in this manner. In dealing with Lewis, McDonald and others, the Guild constantly had trouble in finding some one who would admit having power to act when, after negotiations long drawn out, it demanded decision. The usual reply was that the matter would have to be referred "to Rochester." This was true both before and after Cruickshank arranged for McDonald to supplant Lewis in further dealings with the Guild. Yet, on one occasion when an impasse had been reached and the usual plea of no authority was made, the president of the Guild wired Gannett, demanding a conference "with an authorized representative of the Gannett Newspapers." Gannett replied: "Your telegram received referred to Mr Atwood authorized representative." McDonald testified that he had no hand in selecting the employees for postmerger retention, except to accept without question or change the list made by Lewis. If McDonald had been, as petitioners contend, Press Company's "policy-making official" with real, rather than merely shadowy authority, this action would have been strange in view of Lewis' previous disqualification to deal fur-ther with the Guild and McDonald's supplanting of him in this function. The more reasonable explanation is that McDonald knew that Atwood had approved the list made up by Lewis and recognized that neither he nor Lewis could overrule what Atwood had sanctioned.

In view of this evidence, the conclusion is inevitable that Atwood, more than any other person save perhaps Gannett, exercised a dominant and controlling authority in the affairs of Press Co. and particularly in its relations and dealings with the Guild and its members. He and, through him, Gannett Co., Inc., were responsible for the unfair practices to which the Guild and the complaining employees were subjected. If Lewis was guilty, Atwood was equally so. If Press Co. was guilty, so was Gannett Co., Inc., by virtue of Atwood's domination of the former's affairs.

As against this view and the facts which support it, petitioners say that Press Co. is an autonomous corporation, with McDonald, its treasurer and general manager, as the policy-making official; that Atwood had no official connection or real authority in Press Company's affairs, but acted solely in an "advisory" or "consulting" capacity; that "Rochester," to which were referred all matters of importance for final decision, meant not Atwood or Gannett Co., Inc., or any of its officials, but merely Gannett, Cruickshank and Tripp, acting exclusively in their capacities as officers and directors of Press Co., and wholly without reference to their like capacities as officers and directors of the holding company and of other subsidiary corporations in the Gannett chain.

Apart from their inconsistencies, these arguments are not sustained by the evidence. McDonald, as a "policy-making official," had no real or final authority. When any important point of labor policy came up, he disclaimed authority and referred the matter "to Rochester." This occurred repeatedly. When the Guild protested concerning action taken, he denied responsibility and said that the acts were done or ordered "by Rochester." His impotence in labor matters was matched in others.[1] It was characteristic also of Press Company's other officers, including Lewis, who reported almost daily to Atwood, and

---

[1] For instance, negotiations with Hearst which led to the merger of the two Press Co. papers were begun in May, 1937, but it appears that McDonald knew nothing about them until June 23 following, six days before the agreement was consummated.

Cruickshank, who said he expected to "get hell" from "Rochester" for making concessions to the Guild.

As to Atwood, enough has been stated to show that he was no mere "adviser" or "consultant." "Advice" so persistent and authoritative, coming from such a source, takes on the character of command.

Nor can the view be accepted that "Rochester," to which so much was referred, meant only those persons who were directors and officers of Press Co. and resided or maintained their headquarters in Rochester, acting exclusively in these capacities. However much force such an argument might have, in a case in which the separate links in a corporate chain had maintained a rigid formal and operating distinctiveness in their affairs, Atwood's intervention in Press Company's business destroys all basis for its acceptance here. Other facts also bear out this conclusion. There is no showing that when matters involving decision of important labor policies of Press Co. were referred to "Rochester," meetings of that corporation's board of directors were called to consider and determine them. When McDonald, also a board member, referred such matters to "Rochester" and "Rochester" decided them, McDonald remained in Albany, although that board did meet on occasion as to other matters, and when it did so McDonald attended. It is, of course, not always essential to valid corporate action that directors meet and formally adopt resolutions. But when it is insisted that the formal separateness of corporations integrated as these were be observed by the courts, it is appropriate to reply when the facts require it that neither the corporations concerned nor those who manage them have observed that separateness themselves in operating their affairs or the formalities by which their observance of it may be evidenced. In so complicated a structure of legal authority and operating power as was presented here, one attempting to deal with a particular unit, such as Press Co., may be confronted with a perpetual game of hide-and-seek in the maze of interlocking officials and capacities to find the actual persons who have power to act. That was in fact the situation of the

Guild in its efforts to reach an agreement with Press Co. and the Gannett chain. In this game "Rochester" was a convenient hiding place, a very useful ambiguity. It was reference to "Rochester" by Press Co. officials which made a merry-go-round of the Guild's efforts to secure an agreement.

The majority accept the view that "Rochester" consisted exclusively of Gannett, Tripp and Cruickshank, acting only in their capacities as officers and directors of Press Co., and without regard to their similar positions with Gannett Co., Inc., and its other subsidiaries. In my judgment that view is untenable. The exact identity of "Rochester" cannot and need not be determined. There was no such consistent, identifiable personality. At times "Rochester" was Gannett; at others, it was Atwood; at others, it was some other official or officials of the chain, who may have been officers of Gannett Co., Inc., or of that corporation and of Press Co. In any event the important fact in this background was that the lines of separate corporate interest, management and control were not maintained. They were disregarded, as business convenience dictated in such an integrated structure of power. The focal point of action, and of control, was the holding corporation, Gannett Co., Inc. Through it the entire system of subsidiary operating companies was managed and directed. Responsibility should be commensurate with power. In this case, Gannett Co., Inc., should be held responsible for its constant, close and inescapable domina- of Press Co.

II. The question remains concerning the nature of the appropriate relief. The authorities clearly establish that when a parent corporation has interfered with and dominated its subsidiary in its relations with employees and in perpetrating unfair labor practices upon them, relief may be given against the parent company. Orders of the Board based upon facts and findings similar to those involved here have been enforced by the courts on numerous occasions.[2] Such relief seems required by Section 2(2) of the Wagner Act, which provides that the term "employer" as used in the Act " * * * includes any person

[2] N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 1115 A.L.R. 307; Consolidated Edison Co. v. N. L. R. B., 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Union Drawn Steel Co. v. N. L. R. B., 3 Cir., 1940, 109 F.2d 587;

N. L. R. B. v. Lund, 8 Cir., 1939, 103 F. 2d 815, 818; N.L.R.B. v. Hearst, 9 Cir., 1939, 102 F.2d 658, 660–663. See also N. L. R. B. v. Hopwood Retinning Co., 2 Cir., 1938, 98 F.2d 97, on contempt application, 2 Cir., 1939, 104 F.2d 302.

acting in the interest of an employer, directly or indirectly * * *."

It is said that even if domination of Press Co. by Gannett Co., Inc., is found to exist, relief against the latter should be limited to that contained in the "cease and desist" provisions of the Board's order, and that one must be an employer as the term is "generally used" in order to be required to take affirmative action. I find no basis for such a distinction in the statute. Section 10(c) provides that if any person is found to have engaged in unfair labor practices, the Board "shall issue * * * an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. Nothing in this justifies the view that affirmative relief may be had only against persons who are employers in some more limited sense than as the term is defined in Section 2(2). The relief provisions are remedial [Republic Steel Corp. v. N. L. R. B., 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——], but they also leave to the Board a discretion to determine whether affirmative relief is required and to choose the particular relief to be ordered. N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 1938, 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L. R. 307. When a subsidiary corporation is shown to be dominated by a holding company as Press Co. was by Gannett Co., Inc., in all of its important policies and decisions, the holding company has the power ultimately to determine the question of compliance with every respect to the Board's order, affirmative as well as negative. In my judgment it is not an abuse of the Board's discretion to require the dominating company to make the order against the subsidiary fully effective. Cf. Consolidated Edison Co. v. N. L. R. B., 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, affirming in pertinent respects, 2 Cir., 1938, 95 F.2d 390, 393; N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, enforcing, 1935, 1 N. L. R. B. 1, 43; N. L. R. B. v. Timken Silent Automatic Co., 2 Cir., 1940, 114 F.2d 449. If, because of the unified control, the "cease and desist" provisions can be made effective only by directing the order to the dominating company [cf. N. L. R. B. v. Hearst, 9 Cir., 1939, 102 F.2d 658], that would seem to be true, and for the same reason, concerning its affirmative requirements, notwithstanding the contrary view expressed in the case last cited.

III. I think the evidence was sufficient to sustain the findings and order in respect to Mowers. It was in conflict as to whether the duties assigned him after the merger were of a kind customarily given to a "cub" reporter and inappropriate for a highly skilled and paid man of long experience. Much of petitioners' evidence on this issue was to the effect that all work on a newspaper is equally important. This was opposed by evidence showing that work of the kind assigned to Mowers was of routine character and generally given to young and inexperienced reporters. The evidence upon this question presented merely a question of fact, which the Board has determined against the petitioners. See, 1939, 13 N. L. R. B. 630, 647. There was room for conflicting inferences also on the question whether Mowers' new duties were given to him for sound business reasons in the reorganization following the merger or on account of his affiliation and activities with the Guild. Certainly they differed materially from those he had done previously and there is no claim that he was less skilled or valuable after the merger than before. Mowers complained to the city editor concerning the change, but without results. When he concluded eventually that Press Co. offered him no future, he accepted a temporary position elsewhere at a slightly smaller salary. The effect upon him, subjectively, was to give his exit the character of a subtly forced departure. Whether this was intended by the employer and, if so, because of his union connections and activities, presented questions as to which, upon the evidence, conflicting inferences were possible. The Board having made them in favor of Mowers, its determination should be final and we should not interfere with it.

I also think that the evidence showing the existence of unfair labor practices supports the order of the Board much more strongly than the majority opinion indicates. This is especially true in regard to surveillance [3]

---

[3] Although much of the evidence showing that surveillance existed was derived from the testimony of the private secretary of Lewis, we have been cited to no authority and we know of none which gives to such a witness or her employer a privilege in relation to their communications, however appropriate the creation

of the Guild's activities. The Board found that this constituted coercion on the part of petitioners' executives toward the Guild and its members. This and other evidence of hostility toward the Guild, particularly on Lewis' part, gave character to the culminating acts of unfair practice. [4]

I should like to add also to what the majority have said concerning the charge that the Board prejudged the case, that the Board in self-respect could not do otherwise than it did, namely, repudiate the calumny with vigor. As originally made, it was ambiguous, but by clear innuendo and by repeated refusal to clarify his meaning, both at the hearing before the Board and here, counsel sought to create the impression that the Board members themselves, as distinguished from their prosecuting subordinates, had prejudged the case in a manner which, if true, would have amounted to misconduct in office. When the Board repudiated the implication and asked that counsel clarify his meaning, he disclosed his true intent by asking that the Chairman's remarks be preserved in the record as *further* evidence of the Board's bias." (Italics supplied.) Such a charge would not have been made in court with impunity. It is at least a mild disposition of the matter to say that counsel "brought upon himself" the Board's retort. Certainly, under the circumstances which called it forth, it was not error or "evidence of bias."

I think the order of the Board should be affirmed without modification, except in respect to paragraph 2(b), from which the provision for reimbursement of relief agencies should be stricken in view of Republic Steel Corporation v. N. L. R. B., Nov. 12, 1940, 311 U.S. —, 61 S.Ct. 77, 85 L.Ed. —.

On Petition for Rehearing in No. 7482
February 14, 1941

PER CURIAM.

The National Labor Relations Board, respondent, has filed a petition for rehearing

on the sole ground that we committed error in eliminating paragraph 1 (c) of the order, which reads as follows:

1. Cease and desist from:
* * *
(c) In any manner interfering with, restraining, or coercing their employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157.

Having sustained parts of the order directed specifically against practices found upon substantial evidence to exist, we struck this paragraph on the ground that there was no evidence of any other restraints or coercion to support its terms. Upon reconsideration, the original majority of the court are still of the opinion that it is wholly illogical to order an employer in general terms to "cease and desist" from conduct not shown ever to have been engaged in.

But in the Edison and Fansteel cases[1] the Supreme Court—in the opinion of two judges of this court[2]—appears to have approved the inclusion of the paragraph in every order where the employer is held to have violated any provision of the Act. In deference thereto, we feel in duty bound to reinstate the quoted language, and it is so ordered.

As this conclusion disposes of the only question raised by the petition, a rehearing is denied.

Supplemental Opinion in No. 7482
March 24, 1941

GRONER, C. J.

In its original order in this case, the Board included paragraph 1 (c)—a broad, catch-all provision—expressed in the identi-

---

of such a privilege by legislation may or may not be.

[4] Cf. International Ass'n of Machinists v. N. L. R. B., 1940, 311 U.S. 72, 61 S. Ct. 83, 85 L.Ed. 406.

[1] Edison Co. v. Labor Board, 305 U. S. 197, 231, 59 S.Ct. 206, 83 L.Ed. 126. Labor Board v. Fansteel Corp., 306 U. S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

[2] Judge STEPHENS thinks that the paragraph ought not be contained in the order for the reason that it assumes to restrain acts of a type not shown to have been committed by the employer. He thinks that neither Edison v. Labor Board nor Labor Board v. Fansteel Corp. constitutes any ruling on the subject.

cal language which was set aside and modified in Labor Board v. Express Publishing Co., 312 U.S. ——, 61 S.Ct. 693, 85 L.Ed. ——, decided March 3, 1941. This court at first set the paragraph aside as not sustained by the facts. Then on petition of the Board, this court, Judge Stephens disagreeing, reinstated it on the authority of Labor Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, and Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

In the Express Publishing case, the Supreme Court held that such broad language is not proper in all cases, and modified it severely, on the ground that the Board's finding was limited to one isolated unfair labor practice and that this was no reason to order the employer to cease and desist from all violations of the Act. In distinguishing the Fansteel case (no reference was made to Consolidated Edison), the Court said the record there "disclosed persistent attempts by varying methods to interfere with the right of self-organization in circumstances from which the Board or the court found or could have found the threat of continuing and varying efforts to attain the same end in the future." [312 U.S. ——, 61 S.Ct. 700, 85 L.Ed. ——.]

Upon this court's request, the parties have filed memoranda on the pertinence of this decision to the present case. Petitioner says that the Supreme Court has rejected all of the Board's arguments advanced in its petition for modification in the present case and that the paragraph should again be stricken. Petitioner also says the form of notice, which the order requires it to post, should be modified so as to eliminate any implication of a confessed violation of the Act. Accordingly, petitioner prays the court to make these modifications and asks leave to file its petition to this end.

The Board consents to the modification of the form of notice, but argues that the Supreme Court's decision on the catch-all clause in the order is limited to its own facts, that this is a case showing persistent attempts to evade the act, and that the paragraph should remain as it stands.

In view of the Board's consent the form of notice will be modified as requested, but in regard to paragraph 1 (c), both arguments seem to go too far. The Supreme Court did not simply strike out the paragraph in the Express Publishing Co. case, but modified it to restrain related conduct of the general nature found to have been engaged in. On the other hand, the Supreme Court's opinion is not limited to one narrow set of facts, but expresses a broad principle.

"* * * It is obvious that the order of the Board, which when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing. It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct.

\* \* \* \* \*

"It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts. But we think that without sacrifice of that principle, the National Labor Relations Act does not contemplate that an employer who has unlawfully refused to bargain with his employees shall for the indefinite future, conduct his labor relations at the peril of a summons for contempt on the Board's allegation, for example, that he has discriminated against a labor union in the discharge of an employee, or because his supervisory employees have advised other employees not to join a union. * * *

"The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past. * * * We hold only that the National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found. To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past.

That justification is lacking here. To require it is no more onerous or embarrassing to the Board than to a court. And since we are in a field where subtleties of conduct may play no small part, it is appropriate to add that an order of the Board, like the injunction of a court, is not to be evaded by indirections or formal observances which in fact defy it. After an order to bargain collectively in good faith, for example, discriminatory discharge of union members may so affect the bargaining process as to establish a violation of the order."

 In the present case there were no "persistent attempts by varying methods to interfere with the right of self-organization", as in the Fansteel case which the Supreme Court distinguishes. In that case (5 N.L.R.B. 930), the employer did all sorts of things—refused to bargain, tried to influence employees to drop their chosen union, formed and dominated a company union, and then discharged men for union activity, put the officers of the chosen union in isolated positions, etc. Here, the remarks of Lewis, to which the Board refers, were expressly held to be not coercive or in violation of the Act, but only isolated instances of a man expressing his opinion. There remain only the acts of surveillance and the act of discriminating against certain individual employees in selecting them for discharge because of union affiliation. The conduct forbidden is interfering with the administration of the Guild and discriminating against employees in regard to tenure of employment because of their membership in the Guild, and this does not include in its scope domination of a union, discharge or discrimination because of filing charges or giving testimony, and refusal to bargain collectively, practices denounced by subdivisions (2), (4), and (5) of Section 8. The paragraph 1 (c) should be modified, in accordance with the principle of the Express Publishing case, as follows: (c) In any manner interfering with the administration of the Guild or its membership.

Paragraph 2 (c) will be modified by striking from it the words: "will cease and desist as provided in paragraphs 1 (a) and (b)", and substituting for them the words: "will not engage in the conduct from which it is ordered to cease and desist in paragraphs 1 (a), (b), and (c)."

The order in its final form will read as follows:

"Order

Upon the basis of the foregoing findings of facts and conclusions of law, and pursuant to Section 10 (c) of the National Labor Relations Act [29 U.S.C.A. § 160 (c)], the National Labor Relations Board hereby orders that the respondent The Press Co., Inc., and its officers, agents, successors and assigns shall:

1. Cease and desist from:

(a) Discouraging membership in the Tri-City Newspaper Guild of Albany, Troy, and Schenectady, New York, or any other labor organization of its employees, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of employment;

(b) In any manner exercising surveillance over the meetings or meeting places of the Tri-City Newspaper Guild or the union activities of its employees;

(c) In any manner interfering with the administration of the Guild or its membership.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Offer to Austin J. Scannell, John Wanhope, and Henry E. Christman immediate and full reinstatement to their former or substantially equivalent positions prior to respondent's discrimination against them without prejudice to their seniority and other rights and privileges;

(b) Make whole Austin J. Scannell, John Wanhope, and Henry E. Christman, for any loss of pay they may have suffered by reason of their discharge by payment to each of them, respectively, of a sum of money equal to that which he would have earned as wages during the period from the date of his discharge to the date of the offer of reinstatement, less his net earnings and less any severance pay which might have been given to him; deducting also from the amount otherwise due him moneys received by him during said period for work performed upon Federal, State, county, municipal or other work-relief projects;

(c) Post immediately in conspicuous places in the editorial department of the respondent's Albany plant, a notice stating(1) that the respondent will not engage in the conduct from which it is ordered to cease

and desist in paragraphs 1 (a), (b), and (c) of this order; (2) that employees are free to remain or become members of the Tri-City Newspaper Guild of Albany, Troy, and Schenectady, New York, and that the respondent will not discriminate against any employee because of such membership; (3) maintain such notices for a period of at least sixty (60) days from the date of posting;

(d) Notify the Regional Director for the Second Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith.

And it is further ordered that the allegations of the complaint that the respondent has engaged in unfair labor practices within the meaning of Section 8 (3) of the Act [29 U.S.C.A. § 158 (3)] with respect to Richard Jackson, John Andrews, Raymond H. Mowers and Jo Leonard be, and they hereby are, dismissed."

The decree of this court will be amended to conform, and it is so ordered.

RUTLEDGE, Associate Justice.

I concur in the order insofar as it modifies paragraph 2 (c) of the Board's order by substituting for the words "will cease and desist as aforesaid" the language: "will not engage in the conduct from which it is ordered to cease and desist * * *." But I do not regard the decision in N.L.R.B. v. Express Publishing Co., 312 U.S. ——, 61 S.Ct. 693, 85 L.Ed. ——, March 3, 1941, as requiring elimination of paragraph 1 (c).

As I view this case, it falls, on the facts, somewhere between the Express Publishing Company case and N.L.R.B. v. Fansteel Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, and the other cases which the Supreme Court distinguished in this respect. The former involved, as the majority regarded the case, a single violation of the Act, namely, refusal to bargain. The Fansteel case and others distinguished presented "not * * * isolated acts * * * like the refusal to bargain here, but * * * persistent attempts by varying methods to interfere with the right of self-organization in circumstances from which the Board or the court found or could have found the threat of continuing and varying efforts to attain the same end in the future." The Court did not hold an order like that contained in paragraph 1 (c) inappropriate in such circumstances. Until it does so, I think we are bound to uphold such an order, made in the Board's administrative discretion, when circumstances of this character exist.

In my view they did exist in this case. The findings of the Board show, on evidence which I think fully sustains them, long-continued and persistent interference, restraint and coercion exercised by the employer toward the Guild and its members. These consisted in hostility and active opposition to the Guild evidenced by almost innumerable acts, violent denunciation, surveillance, and discriminatory discharges. Without reviewing the evidence or the findings, I think both the character and number of the acts on the one hand, and the length of time during which they were done on the other, were sufficient to warrant the Board in finding that they offered "the threat of continuing and varying efforts to attain the same end in the future." In my judgment, therefore, paragraph 1 (c) of the Board's order should be retained in the circumstances of this case.